T.C. Memo. 2010-49

UNITED STATES TAX COURT

DEANNA LANGILLE f.k.a. DEANNA BIRDSONG, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17227-08.            Filed March 18, 2010.

Deanna Langille, pro se.

<u>Miriam C. Dillard</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, <u>Judge</u>:  Petitioner Deanna Langille practiced law
in the years in issue (1993, 1994, and 1995), and she also owned
and leased real estate.  The Internal Revenue Service (IRS)
issued a statutory notice of deficiency to Ms. Langille on April

14, 2008, pursuant to section 6212,[1] determining the following income tax deficiencies and fraud penalties:

| Year | Deficiency | Fraud penalty Sec. 6663(a) |
|------|------------|------------|
| 1993 | $44,324 | $33,243 |
| 1994 | 70,683 | 53,012 |
| 1995 | 41,927 | 31,445 |

After a concession,[2] the issues for decision are:

(1) Whether Ms. Langille received from Birdsong & Smith, P.A., unreported passthrough income of $8,689 in 1993 and an unreported passthrough loss of $15,851 in 1994.  We find that she did.

(2) Whether, in connection with Ms. Langille's law practice, she received unreported receipts and paid unreported law practice expenses as follows:

| Year | Additional receipts | Additional expenses |
|------|------------|------------|
| 1993 | $112,150 | $4,643 |
| 1994 | 193,817 | 5,485 |
| 1995 | 255,314 | 135,809 |

We find that she did.

---

[1]Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code of 1986 (the Code, 26 U.S.C.), as amended, all citations of Rules refer to the Tax Court Rules of Practice and Procedure, and amounts are rounded to the nearest dollar.

[2]Respondent concedes that Ms. Langille did not receive $2,587 in capital gain income in 1995.

(3) Whether Ms. Langille received interest income on seller-financed mortgages as follows:

| Year | Mortgage interest income |
|------|--------------------------|
| 1993 | $11,511 |
| 1994 | 9,601 |
| 1995 | 5,977 |

We find that she did.

(4) Whether Ms. Langille realized from her rental activities:  $1,935 less income than she reported in 1993, $4,444 more income than she reported in 1994, and $2,019 more income than she reported in 1995.  We find that she did.

(5) Whether Ms. Langille is liable for the fraud penalty under section 6663(a) for the years in issue.  We hold that she is liable for the fraud penalty for each year but in amounts less than the IRS determined in the notice of deficiency.

FINDINGS OF FACT

This case was tried in Jacksonville, Florida, on May 6, 2009.  We incorporate by this reference the parties' stipulation of facts.

Law Practice

Ms. Langille earned her law degree in 1974 and was a lawyer in private practice during the years in issue.  Ms. Langille and Elinor Smith incorporated Birdsong & Smith, P.A. (the firm), as an S corporation under section 1361(a) in 1990.  They each owned

half its stock, and they practiced law under the name of the firm until they dissolved it (for reasons the record does not show) on October 31, 1994. Thereafter, Ms. Smith practiced law in the same building as Ms. Langille until July 1995, and Ms. Langille operated her own solo practice in that building until she stopped practicing law in November 1996.

Each lawyer had her own client trust account, and each knew of the other's client trust account. Neither lawyer wrote checks against the other's trust account, and neither reviewed nor balanced the other's trust account. Both lawyers disbursed funds from their individual client trust accounts either directly to themselves or to pay personal expenses, as follows:

|  | Personal expenditures | |
| Year | Ms. Langille | Ms. Smith |
| 1993 | $47,670 | $1,080 |
| 1994 | -0- | 2,731 |

Ms. Langille did not report the $47,670 as income in 1993.

During the years in issue Ms. Langille had exclusive control over the account named Birdsong & Smith P.A. General Account (operating account). Only she had access to the operating account monthly statements, and only she wrote checks against that account. She deposited just enough receipts from clients into the operating account to cover law practice expenses (and she claimed those expenses as deductions for the firm). She also wrote checks for distributions to the shareholders from that

account.  Under their agreement Ms. Langille was to provide monthly distribution checks to Ms. Smith representing the net income Ms. Smith earned, i.e., Ms. Smith's income after deducting common expenses.  She distributed $21,631 to Ms. Smith in 1993 and $26,000 in 1994.  She did not issue any distribution checks to herself in 1993, but she distributed $5,000 from the operating account to herself in 1994.

Ms. Langille wrote monthly checks from the operating account to her wholly owned subchapter S corporation Birdsong Management Company (BMC) for the rental of the office building where she practiced law.  She claimed rental expense deductions for the firm for these payments, and she included the receipts in income, as is discussed below.

Ms. Langille diverted legal fees for her own use, bypassing the firm's bank accounts and depositing additional law practice receipts into other accounts, from which she also paid some law practice expenses, as follows:

| Item | Deanna McBride Birdsong Attorney at Law account | DMB Development Co. accounts |
|---|---|---|
| 1993 fees | $111,425 | -0- |
| 1993 expenses | (4,643) | -0- |
| 1994 fees | 192,651 | -0- |
| 1994 expenses | (5,485) | -0- |
| 1995 fees | 12,897 | $169,403 |
| 1995 expenses | (631) | (31,728) |

She did not report these receipts or expenses on her returns.

Ms. Langille kept the books for the firm.  She prepared and filed the firm's tax returns for 1993 and 1994, reporting the following:

| Item | 1993 | 1994 |
|------|------|------|
| Gross receipts | $241,926 | $223,228 |
| Deductions | (185,451) | (158,254) |
| Net income | 56,475 | [1]65,034 |
| Each 50-percent shareholder's share of income | 28,238 | 32,517 |

[1]The 1994 tax return Ms. Langille filed for the firm contains a subtraction error:  The difference between the firm's receipts and deductions (i.e., the firm's net income) is $64,974, not $65,034; and, thus, each shareholder's share of that income is $32,487.

As is noted above, Ms. Langille did not report on the firm's return the law practice income she deposited into the Deanna McBride Birdsong Attorney at Law account in 1993 or 1994, and she did not claim the expenses she paid from that account.  She also did not report as income any of the money that she and Ms. Smith expended from their client trust accounts for personal purposes.

Ms. Langille worked long hours in her law practice throughout the years at issue.  Her real estate activities consumed somewhat less of her time.

Real Estate Activities

Between 1990 and 1992 Ms. Langille sold certain residential real property with seller financing, i.e., she extended mortgages to the purchasers.  During the years in issue, she received

payments of principal and interest on two of these mortgages; and on the third, she received payments until she repurchased the property in August 1994. She did not report any interest or other income from the receipt of these payments during the years in issue, even though she received mortgage interest payments of the following amounts:

| Year | Mortgage interest payments received |
|------|-------------------------------------|
| 1993 | $11,511 |
| 1994 | 9,601 |
| 1995 | 5,977 |
| Total | 27,089 |

Ms. Langille rented her office building and certain residential rental properties through BMC. Ms. Langille's law practice paid rent of $1,500 each month throughout 1993 and 1994 (i.e., $18,000 per year) and $1,600 each month in 1995 (i.e., $19,200 for the year).[3] These amounts were paid to Ms. Langille through BMC. For the first two of those three years she reported the following income and expenses on BMC's Forms 1120S, U.S. Income Tax Return for an S Corporation:

---

[3]Until it dissolved on October 31, 1994, the firm paid rent on the office building. After the dissolution of the firm, Ms. Langille paid rent from her unincorporated law practice. She reported $18,000 rent paid on the firm's tax returns for each of 1993 and 1994. Ms. Langille wrote rent checks for the first seven months of 1995, and the IRS imputed rent for the remaining five months.

|                          | Amounts reported | |
| Item                     | 1993     | 1994     |
| Gross receipts           | $18,000  | $1,212   |
| Repairs and maintenance  | (2,465)  | -0-      |
| Taxes and licenses       | (150)    | -0-      |
| Interest                 | (10,440) | -0-      |
| Total deductions         | (13,055) | -0-      |
| Net income               | 4,945    | 1,212    |

That is, for 1993 Ms. Langille entered $18,000 in gross receipts and amounts for certain expenses for BMC on its Form 1120S and used those expenses to calculate total deductions and net income from renting the office building; but for 1994 she entered not $18,000 but only $1,212 as gross receipts or sales, drew an arrow to carry that figure down the page to the total income line, and drew another arrow to carry that figure to the ordinary income line; she included no other income or expense information on that return.

Although her practice paid $1,600 per month to rent the office building in 1995, Ms. Langille did not file a return for BMC for 1995.

Ms. Langille earned a profit for each year in issue renting the commercial building to her law practice as follows:

| Item                      | 1993   | 1994   | 1995   |
| Office rental net income  | $3,010 | $5,656 | $4,574 |

In addition to her own home and the office building she rented to her law practice, Ms. Langille owned five houses and

nine condominiums, and she rented those residential properties to third parties.[4] She owned outright one of those houses and five of those condominiums, and she had mortgages on the remaining four houses and four condominiums.

Ms. Langille's residential rental activities lost money during each year in issue, and for the years in issue she did not report income or expenses from renting the residential properties. Because of the losses from the residential rentals, her rental activities overall lost money during each year in issue. Adjusting for depreciation, the cash flow from her rental activity was negative for two of three years in issue, as follows:

---

[4]Ms. Langille held the residential rental properties and her personal residence in the name of the David Justin Birdsong Family Trust (the trust). However, in a year not disclosed by the record, a U.S. bankruptcy court held that all of the real estate Ms. Langille ostensibly held in the name of the trust was actually owned by Ms. Langille individually. The record does not reflect any bank accounts in the name of the trust or that the trust had any existence aside from being the putative owner of Ms. Langille's real estate. Ms. Langille did not file any tax returns for the trust during the years in issue, and she does not challenge the IRS's decision to disregard the trust or its conclusion that any income from her rental activities is taxable to her individually.

| Item | 1993 | 1994 | 1995 |
|------|------|------|------|
| Rental income | $36,488 | $58,747 | $61,017 |
| Total expenses | (60,460) | (65,489) | (76,100) |
| Net rental income (loss) | (23,972) | (6,742) | (15,083) |
| Depreciation expense | (9,280) | (11,970) | (14,288) |
| Cash expenses | (51,180) | (53,519) | (61,812) |
| Cash flow from rental activities | (14,692) | 5,228 | (795) |

Individual Income Tax Returns

Ms. Langille prepared and timely filed income tax returns for herself, the firm, and BMC. On her Form 1040, U.S. Individual Income Tax Return, for each year in issue, she claimed head of household filing status and one dependent, her son, and she reported the following:

| Item | 1993 | 1994 | 1995 |
|------|------|------|------|
| Schedule K-1 real estate | $4,945 | -0- | -0- |
| Schedule K-1 lawfirm | 28,238 | -0- | -0- |
| Schedule E | | | |
|   Rents received | --- | [1]$33,729 | [2]$19,200 |
|   Total expenses | --- | -0- | 16,645 |
|     Net income | | 33,729 | 2,555 |
| Schedule C | | | |
|   Law office gross receipts | --- | --- | 130,054 |
|   Law office total expenses | --- | --- | (87,454) |
|     Net law office profit | --- | --- | 42,600 |
|      Total income | 33,183 | 33,729 | 45,155 |

[1]Ms. Langille appears to have added her share of the income from the firm, $32,517, to the net income she reported for BMC, $1,212, and entered that sum, $33,729, as "Rents received" on her 1994 Schedule E, Supplemental Income and Loss (From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.).

[2]The practice paid BMC rent of $1,600 per month in 1995, but Ms. Langille reported her commercial rental income and expenses on Schedule E, and she did not file a Form 1120S for BMC for 1995.

Ms. Smith and Ms. Langille dissolved the firm on October 31, 1994, and Ms. Langille continued practicing law throughout 1994; but she did not file a Schedule C, Profit or Loss From Business, for 1994 to report her law practice income and expenses for November and December 1994. As indicated, she did not report the law practice income she deposited into the Deanna McBride Birdsong Attorney at Law account on the firm's return for 1993 or 1994. She also did not report that income on her individual return for 1993 or 1994.

As is shown above, Ms. Langille reported $130,054 in 1995 law practice receipts on Schedule C.  However, she earned $385,368 from her law practice in 1995, and she deposited those law practice receipts in various accounts, as follows:

| Account | Amount deposited |
| --- | --- |
| Operating account | $183,723 |
| DMB Development Co. operating account | 153,616 |
| DMB Development Co. investment account | 15,788 |
| Deanna McBride Birdsong Attorney at Law account | 12,897 |
| BMC account | 19,344 |
| Total law practice deposits | 385,368 |

Ethics Controversies and Resignation

The Florida Bar reviewed the firm's client trust accounts for 1993 and determined that Ms. Langille had misappropriated funds from her client trust account.  On January 27, 1994, the Florida Supreme Court publicly reprimanded Ms. Langille for professional misconduct.  Fla. Bar v. Birdsong, 634 So. 2d 628 (Fla. 1994).  On October 26, 1995, the Florida Supreme Court suspended Ms. Langille from practicing law for 30 days, imposed 1 year of probation, and required her to complete professional education courses, because the court found that she had continued to assist a client with a lawsuit after a Florida court had issued an order disqualifying her from further representing that client in that matter.  Fla. Bar v. Birdsong, 661 So. 2d 1199 (Fla. 1995).

Ms. Langille stopped practicing law in November 1996.  In 1997 she resigned in lieu of disciplinary proceedings.  <u>Fla. Bar v. Birdsong</u>, 690 So. 2d 1301 (Fla. 1997).

<u>Efforts To Sell The Law Practice</u>

In July 1996 Ms. Langille put her law practice up for sale. She advertised that its gross receipts were $350,000 per year. Ms. Langille met with a prospective buyer on August 26, 1996, and again on September 5, 1996.  This buyer chose not to purchase the law practice.  Instead he reported to the IRS that Ms. Langille had indicated that she was keeping two sets of book for the law practice--one set with reduced income for preparing tax returns and another set with greater income to show potential buyers.

<u>IRS Criminal Investigation</u>

An undercover agent from the IRS's Criminal Investigation Division (CID) posed as a representative of a different prospective buyer of the law practice and met with Ms. Langille on November 5, 1996.  On the basis of the undercover agent's observations and the report from the earlier prospective buyer, the IRS requested and obtained a search warrant.

The IRS searched Ms. Langille's law office on November 15, 1996.  An IRS special agent interviewed Ms. Langille during the search.  She admitted that she prepared her individual tax returns and the firm's corporate tax returns.  She acknowledged

that some of her income might have been unreported, and she asserted that "everyone has unreported income".

When asked to identify entities and bank accounts in which she had an interest, Ms. Langille told the IRS about the firm, the trust, and BMC; and she told the IRS about the firm's operating account, her client trust account, and the BMC account. She did not inform the IRS of any interest in DMB Development Company, nor did she identify the two DMB Development Company accounts (which were at a different bank from the accounts she did identify). She also did not disclose her Deanna McBride Birdsong Attorney at Law account.

The undercover agent had reported that certain financial records were in plastic trash bags and that Ms. Langille had offered those records for inspection and stated that those records would not be sold with the practice but would be destroyed. Following the search of Ms. Langille's office, the IRS departed with 10 or more boxes of records and five 39-gallon plastic bags seized from Ms. Langille's office. The bags contained both garbage and financial records, including income ledgers that closely reconciled to the bank accounts petitioner disclosed.

When the IRS agents sorted through the documents in the plastic bags after the search, they found records for the two DMB

Development Company accounts, including bank statements, canceled checks, and the envelopes the bank used to mail the statements.

The special agent interviewed Ms. Langille on November 19, 1996, when he returned certain records.[5] He asked her about the DMB Development Company accounts. She stated that she thought she had disclosed those accounts to him and that she deposited only rental receipts into those accounts. The agent then specifically asked her about a $47,000 deposit into the DMB Development Company investment account, as that seemed too large an amount for a residential rental receipt. Ms. Langille identified the deposit as a settlement check related to one of the clients of her law practice, and she then admitted to depositing law practice receipts into the DMB Development Company accounts. Total deposits during 1995 into the DMB Development Company accounts were $175,081.[6]

In addition to the special agent who supervised the search of Ms. Langille's office and interviewed her, the CID team included a revenue agent who analyzed the documents seized and

---

[5]The special agent returned records relating to the then-current year, 1996, which is not one of the years in issue.

[6]It appears that DMB Development Company's only existence was in the name Ms. Langille used on the DMB Development Company Investment Account and the DMB Development Company operating account. Ms. Langille provided no evidence that DMB Development Company was a legitimate business, and the record contains no indication that she filed a tax return for any such entity during any year in issue.

performed bank deposits analyses and check spreads to identify income and expenses. In the bags and boxes seized from Ms. Langille's office, the revenue agent discovered a single check drawn on the Deanna McBride Birdsong Attorney at Law account--an account Ms. Langille had not disclosed but into which she had deposited law practice receipts. The IRS had been unaware of this account before the revenue agent found this check. The IRS summoned the bank records for this account and found total deposits of the following amounts:

| Year | Amount deposited |
|------|------------------|
| 1993 | $136,593 |
| 1994 | 210,968 |
| 1995 | 13,359 |
| Total | 360,920 |

IRS Examinations

The IRS summoned the bank records and examined both BMC's and the firm's corporate Federal income tax returns for 1993 and 1994; and it summoned the bank records and examined Ms. Langille's individual returns for 1993, 1994, and 1995.

Examination of the S Corporation's Returns

To determine the income and expenses of the S corporation law firm, the IRS used both the client trust accounts and the operating account. Each shareholder knew about the other's client trust account, and both knew about the firm's operating

account, so the IRS treated deposits to and expenditures from these accounts as income and expenses of the S corporation.[7] However, Ms. Smith had not been aware of the other bank accounts that Ms. Langille used, so the IRS determined the firm's income and expenses without reference to these other accounts, which instead were attributed to Ms. Langille personally.

As for the trust accounts, the IRS did not include in firm income the deposits to the client trust accounts, because that money generally did not belong to the lawyers until they had earned their fees and paid themselves. However, the IRS did include in the firm's income both fees withdrawn from the client trust accounts that were paid directly to the lawyers and any of the lawyers' personal expenses that they paid directly from their

---

[7]Ms. Langille has challenged the IRS's treating, as firm income (half of which is taxable to Ms. Langille), amounts that Ms. Smith took from her client trust account for her own use. However, while Ms. Smith did not know that Ms. Langille was diverting law practice income to her other accounts, each lawyer knew about the operating account and the other's trust account, and the IRS consistently characterized trust expenditures for either lawyer's personal benefit from either trust account as income to the firm, with each lawyer taxable for half of the total. Since Ms. Langille actually took more than half of the total, she arguably received more income than the IRS determined--i.e., income in the full amount of what she took. See James v. United States, 366 U.S. 213, 219-220 (1961) ("wrongful appropriations [are] within the broad sweep of 'gross income'"); Webb v. IRS, 15 F.3d 203, 205 (1st Cir. 1994) (funds misappropriated from a trust by a trustee are includable in his gross income). However, this position would result in a greater deficiency than was determined in the notice of deficiency or pleaded in the answer, so we do not consider an approach more aggressive than respondent has proposed.

trust accounts.  For business-related expenses paid from the client trust accounts, the IRS neither included the payment of those expenses in corporate income nor allowed deductions therefor, because such income and expenses would net to zero.  We find this treatment reasonable.  As for the operating account, all expenditures from the account were allowed as law firm expenses, with the reasonable exception that deductions were not allowed for distributions paid to Ms. Langille and Ms. Smith.

The books that Ms. Langille had kept for the firm did not match the income and expenses that the revenue agent found.  When filing the firm's tax returns, Ms. Langille had understated firm receipts in 1993 and overstated receipts in 1994, and she understated deductible firm expenses in both years.  The IRS determined the following for the firm:

| Item | 1993 | 1994 |
|------|------|------|
| Adjustments to gross receipts | $33,429 | ($21,574) |
| Adjustments to deductions | (16,051) | (10,127) |
| Total adjustments to firm income | 17,378 | (31,701) |
| Corporate income as reported | 56,475 | 65,034 |
| Corrected taxable income | 73,853 | 33,333 |
| | | |
| Adjustment for each shareholder | 8,689 | (15,851) |

Thus, the IRS determined, as to the S Corporation law firm, adjustments that in one year were favorable to Ms. Langille.  However, as we show below, the adjustments related to

Ms. Langille's solo practice outside the firm overwhelmed those favorable adjustments.

Examination of BMC's Returns

For 1993 and 1994 the IRS examined the rental activity that Ms. Langille had undertaken in the name of BMC; and for each year in issue the IRS analyzed Ms. Langille's rental receipts, rent book, and bank account records to determine the rental income and rental expenses for all of Ms. Langille's properties. The revenue agent calculated depreciation schedules for Ms. Langille's rental properties and included depreciation allowances in rental expenses for each year in issue. The IRS concluded that Ms. Langille did not qualify as a real estate professional during the years at issue (because she spent most of her time working in her law practice) and that her passive rental losses are deductible only against passive income. The IRS determined that any income generated by Ms. Langille's renting the office building to her own law practice was not passive income and could not be offset by any passive losses from her other real estate activities. The IRS therefore segregated Ms. Langille's office building rental activity from her residential property rental activity. The IRS determined the following amounts of rental income and expense:

| Item | 1993 | 1994 | 1995 |
|------|------|------|------|
| Rental income | $36,488 | $58,747 | $61,017 |
| Rental expenses | (60,460) | (65,489) | (76,100) |
| Net income (loss) | (23,972) | (6,742) | (15,083) |
| Character of net income (loss) | | | |
| Non-passive (office rental) | 3,010 | 5,656 | 4,574 |
| Passive (residential rentals) | (26,982) | (12,398) | (19,657) |
| | | | |
| Non-passive income | 3,010 | 5,656 | 4,574 |
| Less rental income reported | 4,945 | 1,212 | 2,555 |
| Adjustment to rental income | (1,935) | 4,444 | [1]2,019 |

[1]In the notice of deficiency for 1995 the IRS determined a negative adjustment of $4,189 to Ms. Langille's rental income and a positive adjustment of $2,587 to her capital gain. At trial respondent conceded the capital gain adjustment, and on brief he contends that the correct rental income adjustment is $2,019, as indicated. However, he also stated that he is not seeking any greater deficiency than he determined in the notice of deficiency (which determined a $4,189 reduction rather than a $2,019 increase in rental income). The record does not clearly reflect how the IRS determined the $4,189 reduction in rental income in the notice of deficiency, but given that the reduction is in Ms. Langille's favor and considering respondent's concession that he is not seeking any greater deficiency, we need not address this issue further.

Because Ms. Langille did not have any passive income during the years in issue--the capital gain in 1995 from the sale of real property having been conceded--the IRS contends (and we hold, for the reasons explained below) that no deduction should be allowed for any residential rental real estate losses incurred in the years in issue.

Examination of Ms. Langille's Returns

Ms. Langille not only failed to report the rental income discussed above but also failed to report the $27,089 of interest

income that (as we have found) she received from seller-financed mortgages that she had taken back from purchasers of property. The IRS identified the amounts she received during the years in issue as payments for her prior real estate sales, examined the sales documents and the terms of the mortgages, and calculated the amount of interest paid each month.[8]  Ms. Langille did not report any of the interest payments she received on her individual return, on BMC's corporate return, or on any other return for any of the years in issue.

The IRS also performed a bank deposits and check spread analysis of the DMB Development Company accounts and of the Deanna McBride Birdsong Attorney at Law account, confirming that Ms. Langille had deposited legal fees into those bank accounts and that those receipts were not reflected on the books she kept for her law practice activities, nor were they reported on her individual returns (including the Schedule C for her unincorporated law practice) or on the Forms 1120S for the firm. The IRS also identified legal fees Ms. Langille deposited (along with rental receipts) into the BMC account.[9]  The revenue agent's check spread analysis also determined that Ms. Langille had paid

---

[8]Ms. Langille sold each of the properties before the years in issue, so any gain or loss on the sales themselves is not at issue.

[9]Legal fees deposits into the BMC account were $725 in 1993, $1,167 in 1994, and $19,344 in 1995, totaling $21,236.

additional law practice expenses from those accounts and had not deducted them on any return.

The IRS treated the legal fees that Ms. Langille diverted from the firm and into her other accounts as Schedule C income from her running an unincorporated solo law practice on the side and allowed as deductions from that Schedule C income the previously unreported expenses.[10] The shareholders dissolved the firm on October 31, 1994, and Ms. Langille included her 1995 law practice income on Schedule C. The IRS adjusted the income and expenses on that Schedule C to include all amounts related to the law practice that Ms. Langille deposited to or paid from any of her accounts.

The IRS's analysis produced the following adjustments to Ms. Langille's individual income tax reporting:

---

[10]If the diverted proceeds were attributed to the S corporation, then each shareholder's share of the net income would be increased, and Ms. Smith would be taxable on income that Ms. Langille had diverted for her own use. Ms. Langille has not challenged the IRS's characterization of diverted legal fees as Schedule C income to her rather than as income to the firm.

| Item | 1993 | 1994 | 1995 |
|------|------|------|------|
| Capital gain or (loss) | --- | --- | [1]$2,587 |
| Interest income | $11,511 | $9,601 | 5,977 |
| **Schedule C** | | | |
| Gross receipts | 112,150 | 193,817 | 255,314 |
| Expenses | (4,643) | (5,485) | (135,809) |
| Sch. K-1 income from the firm | 8,689 | (15,851) | n/a |
| Net law practice income | 116,196 | 172,481 | 119,505 |
| Sch. E rental income/expense | (1,935) | 4,444 | [2](4,189) |
| Self employment AGI adjust. | (5,011) | (6,279) | (2,956) |
| Personal exemptions | 752 | 2,940 | 800 |
| Itemized deductions | (10,354) | -0- | (8,950) |
| Standard deduction | 5,450 | -0- | 5,750 |
| Total adjustments | 116,609 | 183,187 | 118,525 |
| Self employment tax | 10,022 | 12,588 | 11,930 |

[1]Respondent conceded the capital gain adjustment at trial, as is discussed above on page 20.

[2]At trial respondent asserted that the correct Schedule E income adjustment for 1995 is a $2,019 increase, but he also stated that he is not seeking any greater deficiency than determined in the notice of deficiency, which determined a $4,189 decrease in rental income, as is discussed above on page 20.

The phaseout of personal exemptions, the self-employment taxes, and the self-employment tax adjustments are computational in nature and flow from the resolution of the other issues. The IRS determined that the sum of the real estate taxes and the mortgage interest Ms. Langille paid on her personal residence in 1993 and 1995 exceeded the standard deduction she claimed on her

returns.   Thus, the IRS allowed the larger itemized deduction for those years.  The IRS determined that the standard deduction was more beneficial for Ms. Langille in 1994.  She has not challenged these adjustments.

Fraud Determination

The IRS determined that Ms. Langille, a lawyer, was aware of the requirement that she report her law practice receipts, rental receipts, and mortgage interest receipts as income, and that she deliberately omitted this income for the purpose of evading Federal income tax.  The IRS compared the sum of the deposits into Ms. Langille's accounts and the amounts withdrawn from the client trust accounts for personal expenses to the amount of income Ms. Langille reported for each year for the firm, BMC, and herself, as follows:

|  | 1993 | 1994 | 1995 |
| --- | --- | --- | --- |
| Total deposits & client trust account income | $449,596 | $451,355 | $442,193 |
| Total income reported | 259,926 | 224,500 | 149,254 |
| Total unreported income | 189,670 | 226,855 | 292,939 |

The IRS determined therefrom that Ms. Langille had significantly understated her income for the years in issue.  The IRS concluded that Ms. Langille intentionally concealed and omitted income with the intent to evade tax she knew she owed.

Criminal Prosecution

The U.S. Attorney's Office for the Middle District of Florida obtained an indictment[11] against Ms. Langille, and she pleaded guilty to one count of the indictment: violating section 7206(1) by willfully filing a false tax return for 1994. The Government had the remaining count of the indictment (a charge as to 1995) dismissed pursuant to the plea agreement. In that plea agreement Ms. Langille admitted that she did not report all of her income for 1994 and 1995. The court sentenced her to time served and 12 months of supervised release and ordered her to pay $144,360 in restitution to the IRS and a $50 special assessment. United States v. Birdsong, No. 8:01CR126T17 (M.D. Fla. Sept. 10, 2004).

Notice of Deficiency and Petition

The IRS issued the notice of deficiency on April 14, 2008. The IRS derived the adjustments in the notice of deficiency from the criminal investigation conducted by the special agent and the analysis performed by the revenue agent. The IRS determined that Ms. Langille is liable for the civil fraud penalty under section 6663 for each year in issue.[12]

--------

[11]The record before us includes the plea agreement but does not include the indictment.

[12]The IRS did not determine an accuracy-related penalty under section 6662 as an alternative to the fraud penalty. Accordingly, we are not asked to decide whether the 20-percent
(continued...)

Ms. Langille filed a timely petition in this Court for redetermination of the deficiency, asserting that she provided a list of business deductions to the IRS but that the IRS did not allow her those deductions. Her petition includes a summary of income and expenses and a summary of further adjustments that she asserts result in her having no aggregate deficiency for the years in issue. When she filed her petition, Ms. Langille resided in Florida.

Trial

Ms. Langille testified at trial, and she did not call any other witnesses. Respondent called the lawyer who answered the advertisement to purchase Ms. Langille's practice.[13] He also called the IRS special agent who searched the office and interviewed Ms. Langille; the revenue agent who analyzed the records and summoned documents, performed the bank deposits

---

[12](...continued)
penalty for negligence or disregard of rules or regulations should apply, pursuant to section 6662(a) and (b)(1), to any portion of the underpayment not attributable to fraud.

[13]This lawyer applied for a monetary award pursuant to section 7623(b) when he reported his concerns to the IRS, and his reporting triggered the investigation into Ms. Langille's tax returns and led to the criminal prosecution and the notice of deficiency. As indicated, Ms. Langille pleaded guilty to willfully filing an inaccurate tax return. The record developed by the IRS following this lawyer's tip is sufficient for us to decide this case without reciting or relying upon details of his testimony.

analyses, and calculated the deficiencies determined by the IRS; and a lawyer who was a former employee of the firm.

Summary of Findings

We find that the IRS's bank deposits analyses of the firm's accounts, the BMC account, and the accounts Ms. Langille held in various names were reasonable, as was its reconstruction of her real estate income and expenses; and we find that Ms. Langille had unreported income and expenses as determined in the notice of deficiency (except as conceded; see supra note 2).

We find further that Ms. Langille was aware of her obligations to maintain books and records of her business activities, that she did not keep records that accurately reflected her income, that she maintained bank accounts under different names, that she diverted law practice receipts away from the firm and into her own accounts, that she failed to disclose all her bank accounts to the IRS, that she did not report any income from her residential rental activities (but that she also did not have any profit on those activities during the years in issue), that she failed to report interest income on mortgage payments she received, and that she intentionally failed to report law practice income. We find that she knew of her obligations to accurately report her income on her tax returns, that her actions were willful, and that she had the fraudulent

intent to evade tax on her unreported law practice income for each year in issue.

However, we do not find that she had the fraudulent intent to evade tax with respect to her unreported mortgage interest income or her commercial rental income.

OPINION

I.   Statute of Limitations

As a threshold matter, we must determine whether the IRS timely issued the notice of deficiency from which Ms. Langille timely filed a petition for redetermination.  The IRS issued the notice of deficiency more than 12 years after Ms. Langille filed her tax return for the last year in issue.

Ms. Langille timely filed her individual income tax returns for the years in issue.  A return is considered filed on the last day prescribed for filing if it is filed before that day.  Sec. 6501(b).  Thus the latest-filed return at issue (for 1995) was deemed filed April 15, 1996.  Generally, the IRS must assess a deficiency within 3 years of the date of filing of the tax return.  Three years from the filing date for the latest year in issue would be April 15, 1999.  The IRS issued the notice of deficiency with respect to all three years on April 14, 2008.  Clearly more than 3 years elapsed (in fact almost 12 years elapsed) between the deemed filing date for Ms. Langille's latest tax return in issue and the date the IRS issued the notice of

deficiency, which is the first step in the process of assessing a deficiency.  If the general rule of section 6501(a) applied, then the IRS would have failed to assess the deficiency within the period of limitations and would be barred from assessing and collecting any of the deficiencies or penalties for the 3 years in issue.

However, section 6501(c) provides exceptions to the general rule, including:

> (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

The period for assessing Ms. Langille's liability for a deficiency determined in this case remains open if she filed "a false or fraudulent return with the intent to evade tax" for the year of the deficiency; if she did, then the exception provided in section 6501(c)(1) permits the IRS to assess the tax for that year "at any time."

As is discussed below in parts IV and V.B, Ms. Langille fraudulently failed to report income in each year in issue, and her intent was to evade tax.  Accordingly, the statute of limitations does not bar assessment; rather, the exception provided in section 6501(c)(1) applies, and the IRS may assess at any time.

## II. Burden of Proof

### A. Generally

The Commissioner's determinations set forth in a notice of deficiency are presumed correct, and generally speaking the taxpayer bears the burden of showing the determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). (The different burden of proof for fraud is discussed below in part II.B.) Deductions and credits are a matter of legislative grace, and the taxpayer bears the burden of proving that she is entitled to any deduction or credit claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). This includes the burden of substantiation. Hradesky v. Commissioner, 65 T.C. 87 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

The unreported income that the IRS determined Ms. Langille earned during the years in issue is predicated on bank deposits-- prima facie evidence sufficient to relieve the IRS of any threshold burden of proving the source of that income. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Under certain circumstances, the burden of proof as to factual matters may shift pursuant to section 7491(a) from the taxpayer to the Commissioner, but only if the taxpayer introduces credible evidence regarding a factual matter affecting her liability and only if she has complied with substantiation

requirements, has maintained all required records, and has cooperated with the IRS's reasonable requests. Sec. 7491(a)(1) and (2). Ms. Langille has not introduced credible evidence raising factual questions about her liabilities (rather, she has made conclusory arguments based on her own summaries of income and expenses, without supporting those summaries with references to exhibits in the record); she has not complied with substantiation or record-keeping requirements; and she did not cooperate with the IRS, specifically with the special agent's request for banking information (rather, the special agent discovered the DMB Development Company accounts and the revenue agent discovered the Deanna McBride Birdsong Attorney at Law account without deliberate help from Ms. Langille). Accordingly, section 7491(a) does not shift the burden to respondent, and Ms. Langille therefore retains the burden of proof with respect to the deficiencies. See Rule 142(a)(1).

B.  Fraud

Conversely, the Commissioner has the burden of proof with respect to the issue of fraud with intent to evade tax, and that burden of proof must be carried by clear and convincing evidence. Sec. 7454(a); Rule 142(b); see Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). He must establish each element of fraud by clear and convincing evidence for each of the years at issue. See sec. 7454(a); Rule 142(b); Smith v. Commissioner, 926 F.2d

1470, 1475 (6th Cir. 1991), affg. T.C. Memo. 1989-171.  Section

6663(b) provides that a determination that any portion of an

underpayment is attributable to fraud results in the entire

underpayment's being treated as attributable to fraud, except any

portion the taxpayer proves is not so attributable.  Thus

respondent must show not only that Ms. Langille has underpaid her

taxes for each year but also that some part of her underpayment

for each year is due to fraud.  See DiLeo v. Commissioner, 96

T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992).

Section 6664(a) defines an underpayment as

the amount by which any tax imposed by this title
exceeds the excess of--

(1) the sum of--

(A) the amount shown as the tax by the
taxpayer on his return, plus

(B) amounts not so shown previously
assessed (or collected without assessment),
over

(2) the amount of rebates made.

Section 6211(a) defines a "deficiency" as the "amount by

which the tax imposed * * * exceeds * * * the amount shown as tax

by the taxpayer upon his return".  The record does not indicate

any previous assessments or collections without assessments nor

any rebates made to Ms. Langille for the years in issue.  Thus,

in this case the underpayment asserted and the deficiency

determined by the IRS are the same.

Therefore, if respondent proves that any of Ms. Langille's deficiency for a particular year is due to fraud, then Ms. Langille will owe the fraud penalty on the entire deficiency, except to the extent that Ms. Langille shows that a given component was not due to fraud.[14]

Thus the burden is initially on respondent to show fraud as to some of the underpayment for each year; and if he satisfies that burden as to even part of the underpayment, then the burden will shift to Ms. Langille to demonstrate that any part of the underpayment is not due to fraud.

III. Passive Activity Limitations

A. General Rules

Congress designed section 469 to prevent taxpayers from reducing taxable income by losses attributable to passive activities. Section 469 operates by generally prohibiting the deduction of passive activity losses from unrelated income, thus permitting passive losses to offset only passive income. Schwalbach v. Commissioner, 111 T.C. 215 (1998). Disallowed passive activity losses are not lost; rather, they are deferred or suspended and are available as a deduction against income from that activity in the next year. Sec. 469(b). Suspended passive

_____

[14]In addition, as is stated in part I above, if respondent proves that Ms. Langille filed a fraudulent return with the intent to evade tax for a year in issue, then pursuant to section 6501(c) the IRS may assess the entire deficiency for that year at any time.

activity losses may be carried forward indefinitely.  Ziegler v. Commissioner, T.C. Memo. 2007-166, affd. 282 Fed. Appx. 869 (2d Cir. 2008).  Finally, upon the taxable disposition of a passive activity, a taxpayer may generally use any remaining suspended passive activity loss from that activity first against passive income from that activity, then against net passive income from other passive activities, and then as a non-passive loss against other income.  Sec. 469(g)(1).

A passive activity is one in which the taxpayer does not materially participate.  Sec. 469(c)(1).  Material participation is defined as involvement in the operations of the activity that is regular, continuous, and substantial.  Sec. 469(h)(1).

Rental activity is treated as a per se passive activity regardless of whether the taxpayer materially participates. Sec. 469(c)(2), (4).  However, professional real estate lessors argued that non-passive classification would be more beneficial to them, and they convinced Congress to amended section 469 in 1993.  Fransen v. United States, 191 F.3d 599, 601 (5th Cir. 1999).  Congress carved out an exception for rental activities of real estate professionals by adding paragraph (7) to subsection (c).  Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13143, 107 Stat. 440, effective for tax years beginning

after December 31, 1993;[15] see Estate of Quick v. Commissioner, 110 T.C. 172, 184 (1998). Under section 469(c)(7)(B), the rental activities of a taxpayer in the real property business (a real estate professional) are not per se passive activities under section 469(c)(2) but rather are treated as trade or business activities and are subject to the material participation requirements of section 469(c)(1). See Sec. 1.469-9(e)(1), Income Tax Regs. (26 C.F.R.), effective for tax years beginning after January 1, 1995. Under section 469(c)(7)(B), a taxpayer qualifies as a real estate professional and is not engaged in a passive activity under section 469(c)(2) if:

> (i) more than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and

> (ii) such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.

B.   Residential Rental Activities

Ms. Langille did not provide any estimate of the number of hours she worked on her rental activities, and she did not allege that she spent more time on her rental activities than she

---

[15]Because of the effective date--tax years beginning after December 31, 1993--this exception would not provide any opportunity for non-passive treatment of rental activities for Ms. Langille's 1993 tax year, even if she could show that she satisfied the requirements of section 469(c)(7).

devoted to her law practice.  The record reflects that Ms. Langille worked long hours in her law office, and there is no evidence that she worked most of those hours on real estate rental activities and not on legal matters.  Ms. Langille has not demonstrated either that she met the 50-percent requirement of section 469(c)(7)(B)(i) or that she satisfied the 750-hour requirement of section 469(c)(7)(B)(ii).  We conclude that she was not a real estate professional for purposes of section 469(c)(7) for 1994 or 1995.  Accordingly, her residential rental real estate activities are per se passive activities for each year in issue.  See supra note 15.

C.   Office Rental Activity

Section 1.469-2(f)(6), Income Tax Regs., is effective for taxable years ending after May 10, 1992, sec. 1.469-11(a)(1), Income Tax Regs., and provides in relevant part:

§ 1.469-2.  Passive activity loss.--* * *

*     *     *     *     *     *     *

(f)(6) Property rented to a nonpassive activity. An amount of the taxpayer's gross rental activity income for the taxable year from an item of property equal to the net rental activity income for the year from that item of property is treated as not from a passive activity if the property--

(i) Is rented for use in a trade or business activity * * * in which the taxpayer materially participates * * * for the taxable year * * *.

"In essence, the regulation provides that when a taxpayer rents property to his own business, the income is not passive

activity income." Fransen v. United States, supra at 600. The IRS identified self-rental of property as presenting an opportunity to shelter income (e.g., by having the passive rental activity charge exorbitant rent to the trade or business, and then using passive activity losses to offset trade or business income) and promulgated this regulation to foreclose that practice. The regulation has been upheld as a valid interpretation of section 469. Id. at 601.

Ms. Langille owned the building where her law practice operated, and she rented the office to her law practice (i.e., to the firm until it dissolved, and to her unincorporated law practice thereafter). As is discussed above in part III.B, she also rented residential real property during the years in issue. The IRS determined that the office rental was self-rental, concluded that any income from that rental activity was not passive income, and thus denied any offset of losses from Ms. Langille's residential real estate rental activities (per se passive activities) against any income from the office building rental (not a passive activity).

It is undisputed that Ms. Langille rented the office building to her law practice for use in its trade or business, and it is clear that Ms. Langille's involvement in the law practice's activities was regular, continuous, and substantial. See sec. 469(h)(1). Accordingly, Ms. Langille materially

participated in the law practice to which she rented the office building, and we sustain the determination that Ms. Langille's income from renting the office to her law practice is nonpassive under section 1.469-2(f)(6), Income Tax Regs. Thus Ms. Langille may not offset office rental income with losses from her passive residential rental activities; rather, those losses are suspended until she either has passive income from those activities or disposes of her interest in those activities. See sec. 469(b) and (g).

IV. Unreported Income

A. Income Reconstruction Generally

Taxpayers bear the responsibility to maintain books and records that are sufficient to establish their income. See sec. 6001; DiLeo v. Commissioner, 96 T.C. at 867; sec. 1.446-1(a)(4), Income Tax Regs. Ms. Langille failed to fulfill that responsibility as to both her law practice and her real estate activities.

The Commissioner may use any of several methods to reconstruct a taxpayer's taxable income; and when a taxpayer fails to keep adequate books and records, the Commissioner is authorized by section 446 to determine the existence and amount of the taxpayer's income by any method that clearly reflects income. See Holland v. United States, 348 U.S. 121, 130-132 (1954) ("To protect the revenue from those who do not render true

accounts, the Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer's books accurately reflects his financial history" (internal quotation marks omitted)); Mallette Bros. Constr. Co. v. United States, 695 F.2d 145, 148 (5th Cir. 1983). The Commissioner has latitude in selecting a method for reconstructing a taxpayer's income, and the method need only be reasonable in light of all surrounding facts and circumstances. Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989).

A bank deposit is prima facie evidence of income, and bank deposits analysis is a method of income reconstruction that this Court has long accepted. Tokarski v. Commissioner, 87 T.C. at 77. When a taxpayer keeps inadequate or incomplete books or records and has large bank deposits, the IRS is not acting arbitrarily or capriciously by resorting to the bank deposits method. See DiLeo v. Commissioner, supra at 867-868. The bank deposits method of reconstruction assumes that all of the money deposited into a taxpayer's account is taxable income unless the taxpayer can show that the deposits are not taxable. See id. at 868; see also Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964). The IRS need not show a likely source of the income when using the bank deposits method, but the IRS must take into account any nontaxable items or deductible expenses of which the IRS has knowledge. See Price v. United States, supra at 677.

B.    Reconstruction of Income and Expenses From
       Ms. Langille's Activities

In the instant case, the IRS chose to apply the bank deposits method.  The special agent identified the DMB Development Company bank accounts, and the revenue agent discovered the Deanna McBride Birdsong Attorney at Law account. Because Ms. Langille's records appeared incomplete, the IRS summoned the bank records for the firm's operating account, the client trust accounts, the BMC account, and the other accounts discovered during the investigation.  The revenue agent performed a detailed check spread analysis to identify legal expenses paid from all these accounts (which expenses the IRS allowed as deductions), rental expenses paid from these accounts (which expenses the IRS allocated to Ms. Langille's rental activities), and personal expenses paid from these accounts (which expenses the IRS did not allow as deductions).  The agent performed a bank deposits analysis to compute gross income; and the record shows that she did not include in income deposits to the client trust accounts, but she did identify personal expenses paid from those accounts and included those payments in income.

The bank deposits analysis was thoroughly documented in the exhibits submitted at trial, which included the revenue agent's work papers and copies of canceled checks, bank statements, rent receipts, law firm fee receipts, and other substantiating documents.  The revenue agent thoroughly supported her analysis,

and we accept her reconstruction of Ms. Langille's income and expenses as reasonable and accurate.

C.  Mortgage Interest Analysis

The revenue agent obtained the loan documents for the mortgages Ms. Langille took back from selling properties, and she calculated the (non-taxable) principal and (taxable) interest portions of the mortgage payments that Ms. Langille received each year.  The revenue agent also obtained the loan documents for the mortgages (on Ms. Langille's rental properties) on which Ms. Langille made payments during the years in issue, in order to differentiate deductible mortgage interest payments from non-deductible principal payments and to ensure that the IRS's determination properly accounted for the mortgage interest expenses.  The revenue agent prepared depreciation schedules for Ms. Langille's properties and calculated the amounts of suspended passive losses that Ms. Langille incurred during each year in issue.  We find the IRS's reconstruction of Ms. Langille's mortgage income and expenses to be reasonable.

D.  Ms. Langille's Contentions

Ms. Langille has not identified any specific errors or omissions in the bank deposits analysis; rather, she has argued generally and summarily that the total of her income and expenses shows that her net unreported income for the three years is less than the IRS determined.  Although the Court invited Ms. Langille

to provide a detailed post-trial brief, clearly delineating errors in the IRS's analysis and supporting any such assertions with specific references to the record evidence, she failed to do so.

Ms. Langille argues on brief that the IRS failed to allow deductions for certain "necessary business expenses such as mortgage interest expense, property taxes, HOA fees, [insurance and] utilities". Ms. Langille has not demonstrated that the revenue agent failed to account for any particular rental business expenses; and her argument for a greater amount of expenses for her rental activity is based in part on her including the total monthly payment amounts for her mortgages on each of her rental properties--ignoring the facts that only the interest portion of mortgage payments is currently deductible and that the revenue agent computed the mortgage interest payments she made and included those amounts in the IRS's analysis. Furthermore, to the extent that she complains of the IRS's determination that the passive activity loss limitations prohibit her from deducting residential rental activity losses from office rental income, interest income, or law practice income, her argument does not survive the section 469 analysis, set out above in part III.

Ms. Langille does allege on brief that the calculations the revenue agent performed at trial to quickly calculate

Ms. Langille's total deposits for the years in issue include "$13,000 which was a transfer from Sun Bank to Barnett [Bank] to open a new account and $16,000 for an account that belonged to a good friend of Petitioner who had a small business for a very short while." Ms. Langille argues that these amounts are not income and were erroneously included by the revenue agent. She provides no documentary support for this assertion, and her unsupported allegations are not proof. See ASAT, Inc. v. Commissioner, 108 T.C. 147, 177 (1997).

Ms. Langille acknowledged the Court's admonition that she be specific on brief, and she apologized for her lack of specificity. She explained: "The point of analyzing these expenses however is not to arrive at an exact amount but rather to show how far off and totally unreasonable the Commissioner's assessment of a tax deficiency is". Ms. Langille clearly missed the point, which was that she had an opportunity on brief to argue her case (and carry her burden) by citing specific exhibits in evidence and providing precise rebuttals to the IRS's income and expense analysis. Instead, she complained vaguely but failed to prove at trial and to support on brief her assertions that she repaid amounts she took from her client trust account (by not taking future fees and expense reimbursements from the trust account), that Ms. Smith's personal expenditures from her client trust account are not income to her (ignoring the implications of

their decision to practice law as equal shareholders in an S corporation),[16] that the IRS did not allow rental expenses, that the IRS limited certain personal deductions due to income limitations, that various deductible business expenses were not credited, and that certain deposits are not income.

She included no record references and no particularized answer to the IRS's very detailed income and expense analysis of her activities. Rather, she argues that her generalized adjustments show that the summary exhibit she introduced "in which she totaled all deposits in all business and personal bank accounts and all withdrawals is fairly accurate." She argues that the amount of her unreported taxable income is much smaller than the amount determined by the IRS, but without showing, with specific reference to evidence admitted in the record, precisely how she reaches that conclusion.[17]

---

[16]Ms. Langille also ignores the fact that her trust account misappropriations dwarfed Ms. Smith's ($47,670 vs. $3,811), yet the IRS held Ms. Langille liable for only 50 percent of that income.

[17]In her summary exhibit Ms. Langille asserted that the sum of her net taxable income for the 3 years in issue was $147,799, while on brief she asserted the correct figure was $188,934. She then subtracted the $112,066 total income reported on Forms 1040, arriving at unreported income of $35,733 (summary exhibit) or $76,868 (brief). She argues that both figures are "a long, long way from the amount, $418,320, alleged by the Commissioner." The IRS's analysis is well supported while Ms. Langille's sums are unreconciled, and Ms. Langille has identified neither errors in nor any necessary adjustments to the IRS's determinations.

E.   Unreported Income Conclusion

Ms. Langille has not identified any specific errors in the IRS's analysis, and her challenges on brief to respondent's proposed findings of fact are unsupported by evidentiary references.  Ms. Langille has not demonstrated that her unreported income for the years in issue differs from the IRS's determinations.  As noted, a taxpayer bears the burden of showing that the IRS's determination is in error, and Ms. Langille has failed to carry that burden.

The IRS's deficiency determinations are sustained, with the exception of the portion due to the capital gain item conceded. See supra note 2.

V.   Fraud Penalties

A.   Legal Principles

As indicated above in part II.B, respondent has the burden of proving fraud by clear and convincing evidence, and he must prove (1) that Ms. Langille underpaid her taxes in each year and (2) that she intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent tax collection.  See Parks v. Commissioner, 94 T.C. 654, 661 (1990).  Fraud is an actual wrongdoing committed with the intent to evade a tax believed to be owed.  Marshall v. Commissioner, 85 T.C. 267, 272 (1985). Fraud is never presumed, and the Commissioner must produce independent evidence of fraudulent intent to establish fraud.

Petzoldt v. Commissioner, 92 T.C. at 699. Whether fraud exists is a question of fact, and before finding fraud a court must consider the entire record and the taxpayer's entire course of conduct. Id. "Fraud 'does not include negligence, carelessness, misunderstanding or unintentional understatement of income.'" Zhadanov v. Commissioner, T.C. Memo. 2002-104 (quoting United States v. Pechenik, 236 F.2d 844, 846 (3d Cir. 1956)). As indicated above in part II.B, if the Commissioner demonstrates fraud as to any portion of an underpayment, then the entire underpayment is deemed due to fraud unless the taxpayer shows by a preponderance of the evidence that some or all of the underpayment is not due to fraud.

Courts have developed a nonexclusive list of factors that demonstrate fraudulent intent. These "badges of fraud" include: (1) understating income; (2) maintaining inadequate records; (3) implausible or inconsistent explanations of behavior; (4) concealing income or assets; (5) failing to cooperate with tax authorities; (6) engaging in illegal activities; (7) an intent to mislead, which may be inferred from a pattern of conduct; (8) lack of credibility of the taxpayer's testimony; (9) filing false documents; (10) failing to file tax returns; and (11) dealing in cash. Spies v. United States, 317 U.S. 492, 499 (1943); Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Although no single factor is necessarily sufficient to establish

fraud, the combination of a number of factors constitutes persuasive evidence. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.

B.   Ms. Langille's Underpayments Due to Fraud

The IRS asserted the presence of the following indicia of fraud in this case, in that Ms. Langille--

1.   Substantially understated her law practice income.
2.   Maintained records for her reported income. However, during the search warrant the bank records for the unreported law practice income were in the garbage. Still, the records for the corporation are incomplete and do not tie to the amounts reported.
3.   Opened bank accounts in a fictitious name, DMB Development Company [Operating Account] and DMB Development Company, Investment Account.
4.   Opened bank accounts in her name only, which she used to divert law practice income from her partner.
5.   Failed to disclose the unreported law practice accounts to the Special Agent [who searched her office and interviewed her and her staff].
6.   When confronted about the accounts stated, incorrectly, that they contained rental income vs. law practice income.
7.   Stated to the Special Agent that "Probably, everyone has unreported income."
8.   Incorrectly told the special agent that all of her rental receipts were deposited when an analysis showed that a significant portion was not deposited.
9.   Credit card payments on personal cards were higher each year than [the amount of income] the taxpayer reported on her return.
10.  The taxpayer left off an entire source of income-- interest income from seller-financed mortgages.
11.  The taxpayer diverted law practice trust monies for personal use.

Respondent thus contends that the following badges of fraud are present:  (1) understating income; (2) maintaining inadequate

records; (3) implausible or inconsistent explanations of behavior; (4) concealing income or assets; (5) engaging in illegal activities; (6) failing to cooperate with tax authorities; (7) an intent to mislead; and (8) filing false documents.[18]

We find many of those badges of fraud to be present. First, Ms. Langille understated her law practice income for every year in issue. Second, she maintained inadequate records: Those she kept reflected only the income she intended to report and not the law practice income she intentionally diverted into other accounts; the special agent found some of her records in garbage bags--hardly a credible storage or filing system; and she told prospective purchasers that not all of the records documenting the law practice income would be permanently available. Third, her explanations are implausible: She claimed to have diverted trust account deposits into her personal account for the convenience of a client, and she claimed that she repaid trust account amounts used for personal expenses and that she intentionally refrained from taking fees or reimbursements later from her client trust account as a means to replace the funds.

---

[18]Respondent's counsel has implied that Ms. Langille engaged in illegal activities when she diverted funds from the firm into her own accounts and when she used client trust account funds for personal purposes. The record before us is far from clear on the details of Ms. Langille's ethical and disciplinary proceedings and in any event does not show that she has been indicted or convicted of any crimes related to these activities.

The convenience argument is not credible, the alleged repayment is not supported by the bank records analyzed by the IRS, and her choosing not to take reimbursements or fees in the future did not change the character of the money she took from the trust account when she took it. It was income when taken, regardless of whether she considered it repaid when she allegedly forwent payments later. Fourth, Ms. Langille concealed income by diverting payments to the firm into the DMB Development Company accounts and the Deanna McBride Birdsong Attorney at Law account. Fifth, she engaged in illegal activities (i.e., willfully filed tax returns she did not believe to be true and correct as to every material matter, the crime to which she pleaded guilty). Sixth, she failed to cooperate with IRS investigators by not identifying all the entities she was involved with when the special agent interviewed her (i.e., omitting the apparently fictitious business called DMB Development Company) and by failing to identify every bank account she used (i.e., omitting the DMB Development Company accounts and the Deanna McBride Birdsong Attorney at Law account). Seventh, her conduct supports a reasonable inference (and we do infer) that she intended to mislead: (i) by diverting law practice funds into other accounts; (ii) by paying personal expenses directly from her client trust account; (iii) by keeping books reflecting only the income she intended to report; and (iv) by omitting law practice

income from her returns and not offering any explanation for her failure to report that income. Eighth, she filed false tax returns, as she admitted in her plea agreement for 1994 and 1995, and as we find she did for 1993. Accordingly, we find Ms. Langille's actions were intended to prevent tax collection by concealing her income and misleading the IRS.[19]

We find fraudulent Ms. Langille's failure to report the following income items:

| Item | 1993 | 1994 | 1995 |
|------|------|------|------|
| Schedule C gross receipts | $112,150 | $193,817 | $255,314 |
| Sch. K-1 income from the firm | 8,689 | --- | --- |

Ms. Langille has offered no explanation for failing to include these items of income in her tax returns, and she has not shown that her omission resulted from mere negligence or carelessness and not from fraud. On the basis of our finding that she intentionally omitted this income, we find that respondent has shown that at least some of Ms. Langille's underpayment in each of the years in issue was due to fraud.[20] Unless Ms. Langille

---

[19]In her plea agreement, Ms. Langille admitted telling a prospective purchaser of her law practice "that she did not report all her income and was able to do so because she was smarter than the IRS."

[20]A necessary consequence of our finding fraud for at least some of the underpayment for each year is that the exception in section 6501(c)(1) applies to (i) trigger the exception to the statute of limitations provided in section 6501(a) and (ii) authorize the IRS to assess at any time (and hence to issue

(continued...)

demonstrates by a preponderance of the evidence that part of the underpayment is not due to fraud, the entire underpayment for each year is treated as due to fraud. See sec. 6663(b).

Ms. Langille testified that she became overwhelmed each year, after preparing the firm's Form 1120S, when she realized that she had a net loss from her rental activities. She asserts that she was uncertain how to report a rental loss and that since no tax is due on a loss, she felt she was doing nothing wrong in not reporting all of her real estate income--i.e., omitting her residential rental income and mortgage interest income.

Although her subjective perceptions ignored some of the applicable legal principles, those perceptions were plausible. Combining Ms. Langille's mortgage interest income with her net rental income (without separating nonpassive and passive rental activities) shows:

| Item | 1993 | 1994 | 1995 | Total |
|---|---|---|---|---|
| Mortgage interest income | $11,511 | $9,601 | $5,977 | $27,089 |
| Net rental income (loss) | (23,972) | (6,742) | (15,083) | (45,797) |
| Net real estate income | (12,461) | 2,859 | (9,106) | (18,708) |

Thus, Ms. Langille's belief was correct for 1993 and 1995--i.e., her real estate transactions did result in net losses for those two years. For 1994 the result is a slight profit, but for the

---

[20](...continued)
the notice of deficiency at any time), as is discussed above in pt. I.

three years combined the record shows that the real estate activities (netting mortgage interest income against rental losses) produced an economic loss over the years in issue.

As is discussed above in part III, the self-rental passive activity rule of section 1.469-2(f)(6), Income Tax Regs., prohibits Ms. Langille from offsetting her residential rental real estate losses against the deemed non-passive self-rental income earned from renting the office building to her law practice. However, as is also discussed above, fraud is an actual wrongdoing committed with the intent to evade a tax believed to be owed. <u>Marshall v. Commissioner</u>, 85 T.C. at 272. The Code's "passive activity" rules are hardly intuitive, and we cannot say that it was fraudulent for Ms. Langille, suffering net negative cash flow of $10,259 from her rental activity over the years in issue, to fail to realize that the passive activity rules required her to report positive income.[21]  While Ms. Langille's reporting of her rental income and expenses was negligent (and her entering an arbitrary income amount in 1994 and omitting her actual expenses was willful, see sec. 7206(1)), we are satisfied that she did not omit her rental activity income with the requisite intent to evade a tax she believed she owed;

---

[21]Ms. Langille may also have thought she could avoid reporting her mortgage interest income because it was offset by mortgage interest she paid on loans encumbering the properties she rented. This, too, is wrong, but the error was negligent and not fraudulent.

and we do not find that she intended to conceal, mislead, or otherwise prevent tax collection with respect to her rental activities. She believed she could net all her rental activities and that the net was negative for each year in issue. Her belief was based on ignorance and was incorrect, but her action as to this income was negligent rather than fraudulent.

Ms. Langille seems to argue that she should be able to deduct the entirety of her mortgage payments (both principal and interest) because from a cashflow perspective that is the amount she paid each month. But that contention is clearly wrong; only the interest portion of such payments is currently deductible.

Ms. Langille has not shown that any of the underpayment resulting from her unreported law practice income for any year in issue resulted from anything other than fraud. The only portions of the underpayment Ms. Langille has demonstrated did not result from fraud are those arising from her rental income and her mortgage interest income. Accordingly, we do not sustain the section 6663(a) fraud penalty as determined in the notice of deficiency as it applies to these items, but we sustain the fraud penalty as to her unreported law practice income.

To reflect the foregoing,

Decision will be entered under Rule 155.