T.C. Memo. 2012-281

UNITED STATES TAX COURT

JO DELIA HOVIND, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1362-10.                    Filed October 3, 2012.

James L. Chase, for petitioner.

Jason D. Laseter, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge:  In a notice of deficiency dated November 20, 2009,

respondent determined deficiencies in petitioner's Federal income tax, additions to

[*2] tax under section 6651(a)(1), and civil fraud penalties under section 6663(a) as

follows:[1]

| Year | Deficiency | Additions to tax Sec. 6651(a)(1) | Penalties Sec. 6663(a) |
|------|-----------|------------------|------------------|
| 1998 | $111,959 | $28,373 | $83,969 |
| 1999 | 192,763 | 48,191 | 144,572 |
| 2000 | 191,334 | 47,833 | 143,500 |
| 2001 | 153,432 | 38,358 | 115,074 |
| 2002 | 153,300 | 38,325 | 114,975 |
| 2003 | 135,442 | 33,860 | 101,581 |
| 2004 | 265,445 | 66,361 | 199,084 |
| 2005 | 297,353 | 74,338 | 223,015 |
| 2006 | 146,487 | 36,622 | 109,865 |

After concessions,[2] the issues for decision are: (1) whether and to what extent

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts have been rounded to the nearest dollar.

[2]In the notice of deficiency respondent made the following adjustments: (1) increased gross receipts on petitioner's Schedules C, Profit or Loss From Business, for the years at issue; (2) determined Schedule C business expenses for the years at issue; (3) increased petitioner's interest income for 2000-04; (4) increased petitioner's self-employment tax for the years at issue; (5) disallowed petitioner's claimed personal exemption deductions for the years at issue; and (6) allowed petitioner a rate reduction credit of $300 for 2001.

In her petition, petitioner assigns error only to respondent's determinations that she received interest income in 2000-02 and that she received additional Schedule C income during the years at issue. Ordinarily we deem any issue not raised in the assignments of error in the petition conceded. See Rule 34(b)(4).

(continued...)

[*3] petitioner had unreported Schedule C income and expenses (collectively, net profit) attributable to Creation Science Evangelism (CSE) and Dinosaur Adventure Land (DAL) for each of the years at issue; (2) whether petitioner is liable for additions to tax under section 6651(a)(1) for failing to timely file her income tax return for each of the years at issue; and (3) whether petitioner is liable for the fraud penalty under section 6663(a) for each of the years at issue.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference. Petitioner resided in Florida when she filed her petition.

---

[2](...continued)
Accordingly we conclude that petitioner has conceded the adjustments with respect to her self-employment tax, her personal exemptions, and the rate reduction credit. While petitioner did not expressly challenge respondent's determinations with respect to the Schedule C expenses, we construe petitioner's argument as relating to the allocation of the Schedule C net profit (gross income minus expenses). Accordingly, we address petitioner's liability for the unreported Schedule C net profit and the unreported interest income in this opinion.

[3]In her petition, petitioner contends that respondent has waived the "penalties" for 1998. Petitioner offers no support for this contention, and in his brief respondent contends that she is liable for both the sec. 6651(a)(1) addition to tax and the sec. 6663(a) penalty for 1998.

**[*4]** I.    Background

Petitioner and Kent E. Hovind (Mr. Hovind) married in 1973.  After marrying, petitioner and Mr. Hovind moved to Michigan where they both attended Midwestern Baptist College.  Between 1977 and 1979 petitioner gave birth to her three children, Kent Andrew Hovind, Eric Hovind, and Marlissa Hovind.

In January 1989 petitioner and her family moved to Pensacola, Florida. Petitioner began attending Pensacola Christian College and eventually received both her bachelor's and master's degrees in music.  In 1992 she received a second master of arts degree in sacred music.  In 1993 petitioner and Mr. Hovind acquired by warranty deed property at 29 Cummings Road (29 Cummings Road property) which they used as their personal residence during the years at issue.

II.    Founding of CSE

Mr. Hovind established CSE in 1989.[4]  CSE purported to be a nondenominational religious organization that advocated the message of creation science and opposed the theory of evolution.  CSE promoted its message through live lectures by Mr. Hovind and Eric Hovind.  Mr. Hovind frequently traveled,

---

[4]On a date or dates that are not in the record, petitioner and Mr. Hovind transferred some of their assets to CSE.  At some point they transferred the CSE assets to an unincorporated business trust organization, and later, to an alleged auxiliary of the Faith Baptist Church.

**[\*5]** domestically and internationally, for speaking engagements, and petitioner occasionally accompanied Mr. Hovind on these trips.

CSE also promoted its message through sales of merchandise that customers could purchase at the lectures or order through the mail. Most of CSE's income derived from sales of merchandise, including clothing, videotapes, DVDs, CDs, bumper stickers, and mouse pads.[5] In addition to merchandise promoting the message of creation science, CSE sold books and videotapes promoting antigovernment and tax-protester arguments.[6] As CSE expanded its property holdings, CSE also generated income by renting its properties.

---

[5]For example, in 2003 CSE earned gross receipts from merchandise sales of $1,657,329.

[6]For example, CSE sold "Good News for 1040 Filers", a video by Joe Sweet, an individual who promoted the use of unincorporated business trust organizations to evade Federal income tax. The catalog description states that the video "[e]xplains how income tax is voluntary for most people". Mr. Sweet has been permanently enjoined from "[o]rganizing, promoting, marketing, or selling the tax shelter, plan, or arrangement entitled 'GOOD NEWS for FORM 1040 Filers: Your Compliance is Strictly VOLUNTARY! BAD NEWS for the IRS!'" and from "[o]rganizing, promoting, marketing, or selling 'Unincorporated Business Trust Organizations' (a/k/a 'UBTOs') or any other abusive tax shelter, plan, or arrangement that incites taxpayers to attempt to violate the internal revenue laws". Petitioner wrote at least one check drawn on a CSE account to Mr. Sweet.

[*6] III.　　Expansion of CSE:  1999-2002

From 1999 through 2002 CSE expanded its operations by purchasing properties surrounding the 29 Cummings Road property.  In October 1999 Mr. Hovind signed a warranty deed for property at 21-23 Cummings Road (21-23 Cummings Road property).[7]  In March 2000 Mr. Hovind acquired property at 400 Cummings Road (400 Cummings Road property).  In May 2001 petitioner and Mr. Hovind purchased property at 5720 North Palafox (5720 North Palafox property) from Darlene Porter.[8]  In September 2001 petitioner and Mr. Hovind purchased property at 5800 North Palafox (5800 North Palafox property) from Delores Choron.[9]

---

[7]Petitioner drafted and signed two checks drawn on a CSE account to pay for the property.

[8]The settlement statement for the 5720 North Palafox property recites that petitioner and Mr. Hovind were to pay $126,391 for the property.  To pay for the property, CSE gave AmSouth two checks drawn on CSE accounts totaling $126,391 in exchange for an official bank check in the same amount.  Petitioner drafted and signed the two checks drawn on the CSE accounts.  Petitioner and Mr. Hovind also purchased personal property from Ms. Porter.  As partial payment for Ms. Porter's personal property, CSE gave AmSouth a check drawn on a CSE account in exchange for four official bank checks totaling $30,000.  Petitioner drafted and signed the check drawn on a CSE account.   She also drafted and signed a check drawn on a CSE account made payable to Ms. Porter.

[9]During 2002-03 petitioner drafted and signed 11 checks drawn on a CSE account made payable to Ms. Choron.

[*7] IV.    Development of Ministerial Trusts

In 2002 Mr. Hovind decided to change the ownership structure of CSE and to that end contacted Glenn Stoll, the director of Remedies at Law.[10]  Mr. Stoll directed clients to form personal ministries which, once created, could be used to form ministerial trusts to manage ministry assets including management of assets on a tax-free basis.  Mr. Stoll directed clients to associate each ministerial trust with a corporation sole.[11]

On May 12, 2003, Mr. Hovind created a personal ministry using the CSE Foundation Trust package Mr. Stoll provided.  Mr. Hovind executed formal written trust agreements for two trusts, Creation Science Evangelism Ministry and the Creation Science Evangelism Foundation.  Mr. Hovind named the Director of

---

[10]Remedies at Law is an organization that purports to provide financial advice to religious organizations and individuals.  During 2003 petitioner drafted and signed three checks drawn on a CSE account made payable to Remedies at Law. Mr. Stoll has been permanently enjoined from "organizing, promoting, marketing, or selling any trust, tax shelter, plan or arrangement" and from "[p]romoting the false and frivolous position that Federal income taxes can be reduced or eliminated by using 'Corporations Sole' and 'Ministerial Trusts' to shelter income".

[11]The Internal Revenue Service (IRS) has defined a corporation sole as "a corporate form authorized under certain state laws to enable bona fide religious leaders to hold property and conduct business for the benefit of the religious entity." Rev. Rul. 2004-27, 2004-1 C.B. 625, 626; see also Chambers v. Commissioner, T.C. Memo. 2011-114, slip op. at 36.

[*8] Ecclesiastical Enterprises and the Firm Foundation, corporations sole established by Mr. Stoll, as trustees. In the trust package both the Director of Ecclesiastical Enterprises and the Firm Foundation are identified as being under the jurisdiction of the "Kingdom of Heaven". Mr. Hovind is listed as the "CEO Manager" of Creation Science Evangelism Ministry. Petitioner is listed as the "First Position Successor".

The trust package included sample warranty deeds that demonstrated how to transfer property to a ministerial trust. Petitioner and/or Mr. Hovind purportedly transferred title of the following properties: (1) the 29 Cummings Road property;[12] (2) the 21-23 Cummings Road property;[13] (3) the 400 Cummings Road

---

[12]On May 30, 2000, petitioner and Mr. Hovind signed a warranty deed conveying the 29 Cummings Road property to the Faith Baptist Fellowship. The documentary stamps on the warranty deed indicate that the property was transferred for little or no value. On August 18, 2004, Mr. Hovind signed a quitclaim deed on behalf of himself and the Faith Baptist Fellowship transferring the 29 Cummings Road property to the "29 Cummings Road Trust, a Ministerial Property Trust, its trustee being Director of Ecclesiastical Enterprises". Despite these alleged transfers petitioner and Mr. Hovind maintained a homeowner's insurance policy on the property from at least December 8, 2003, through December 8, 2008. CSE paid petitioner's and Mr. Hovind's insurance premiums from December 8, 2003, through December 7, 2004.

[13]On May 30, 2000, Mr. Hovind signed a warranty deed conveying the 21-23 Cummings Road property to "Elder Kent Hovind, Trustee for Faith Baptist Fellowship" for little or no value. On August 10, 2000, Mr. Hovind, as trustee for the Faith Baptist Fellowship, signed a warranty deed conveying a portion of the 21-

(continued...)

[*9] property;[14] (4) the 5720 North Palafox property;[15] and (5) the 5800 North Palafox property.[16]

## V.  Expansion of CSE:  2003-05

In November 2003 CSE acquired property at 116 Cummings Road (116 Cummings Road property).[17]  In May 2004 CSE acquired property at 12 Oleander

---

[13](...continued)
23 Cummings Road property to Eric Hovind.  On August 18, 2004, Mr. Hovind signed a quitclaim deed conveying another portion of the 21-23 Cummings Road property to the "21 Cummings Road Trust, a Ministerial Property Trust, its trustee being Director of Ecclesiastical Enterprises".

[14]On May 30, 2000, Mr. Hovind signed a warranty deed conveying the 400 Cummings Road property to the Faith Baptist Fellowship.  The documentary stamps on the warranty deed indicate that the property was transferred for little or no value. On August 18, 2004, Mr. Hovind signed a quitclaim deed on behalf of himself and the Faith Baptist Fellowship allegedly transferring the 400 Cummings Road property to the "400 Block Cummings Subdivision Trust, a Ministerial Property Trust, its trustee being Director of Ecclesiastical Enterprises".

[15]On August 18, 2004, petitioner and Mr. Hovind signed a quitclaim deed conveying the 5720 North Palafox property to the "5720 N. Palafox Trust, a Ministerial Property Trust, its trustee being Director of Ecclesiastical Enterprises".

[16]On August 18, 2004, Mr. Hovind signed a quitclaim deed conveying the 5800 North Palafox property from the Faith Baptist Fellowship to the "5800 N. Palafox Trust, a Ministerial Property Trust, its trustee being Director of Ecclesiastical Enterprises".  There is no deed in the record documenting the alleged conveyance of the 5800 North Palafox property from petitioner and Mr. Hovind to the Faith Baptist Fellowship.

[17]Petitioner drafted and signed two checks drawn on a CSE account to pay for the 116 Cummings Road property.

**[*10]** Drive. In June 2004 CSE acquired property at 100 Cummings Road. In August 2005 CSE acquired property at 120 Oleander Drive. The Creation Science Evangelism Foundation held title to the properties.

CSE built a biblically themed amusement park, DAL, on the acquired properties.[18] DAL featured rides, a museum, and a science center. DAL provided tours for visitors and hosted birthday parties. DAL charged admission for entry to the park, sold concessions, and offered merchandise for sale.

VI.   Operation of CSE

A.   In General

During the years at issue Mr. Hovind and petitioner operated CSE as an unincorporated entity.[19] CSE maintained its primary office at 29 Cummings Drive.

B.   Bank Accounts

From January 1, 1998, through August 31, 2006, CSE maintained an account ending in 8656 (account 8656) at AmSouth Bank. From October 17,

---

[18]There was no division between the operations or finances of CSE and DAL. Employees often performed tasks for both CSE and DAL. DAL was not organized as a separate entity. Accordingly, we find that DAL was an asset of CSE and its revenue and expenses were properly treated as revenue and expenses of CSE.

[19]Special Agent Scott Schneider discovered no corporate or partnership documents during the course of his investigation.

[*11] 2000, through May 30, 2003, CSE maintained a money market account ending in 5129 (account 5129) at AmSouth Bank. From November 29, 2002, through December 29, 2006, CSE maintained an account ending in 1872 (account 1872) at Regions Bank. Beginning June 6, 2006, CSE maintained an account ending in 8577 (account 8577) at Wachovia Bank.

C.    Petitioner's Role

Petitioner worked at CSE during the years at issue. Her titles included "assistant office manager", "assistant trust secretary", and "managing director". Petitioner was identified as a supervisor on internal documents and directly supervised at least three employees. She maintained a regular workspace at CSE.

Petitioner's responsibilities included maintaining records for payroll, vacation pay, and benefits;[20] paying all ministry bills; collecting rent; providing financial data to Mr. Hovind for future planning; keeping the buildings clean and supplied; and keeping in contact with Mr. Hovind to make decisions in his absence. During the years at issue petitioner also reconciled the bank statements for account 8656. She met with Mr. Hovind weekly to keep him informed of

---

[20]Until 2003 employees were paid in cash. Employee compensation was not characterized as wages; instead, petitioner and Mr. Hovind referred to the payments as "love offerings". CSE did not withhold payroll taxes from employee compensation.

**[*12]** CSE's financial status, including current figures for bank deposits, loans, payroll expenses, and merchandise sales. She also issued instructions and memoranda to the entire staff. Petitioner, along with Mr. Hovind, was responsible for authorizing all expenditures over $20. Petitioner did not receive wages for her services at CSE.

D.    Petitioner's and Mr. Hovind's Finances

Although petitioner and Mr. Hovind maintained separate personal bank accounts,[21] there was no distinction between their finances and CSE's finances.[22] CSE paid petitioner's living expenses, including room and board, and provided an automobile. Petitioner drafted and signed checks drawn on CSE bank accounts for

---

[21]During the years at issue petitioner and Mr. Hovind maintained the following personal bank accounts: (1) from December 23, 1997, through January 25, 2007, an account at First Union National Bank (later Wachovia Bank, N.A., presently Wells Fargo Bank, N.A.) under the name "Mrs. Jo Delia Hovind; Kent E. Hovind" (account 8049); and (2) from December 18, 1997, through January 20, 1999, an account at Sun Trust Bank under the name "Dr. Kent E. Hovind or Jo Delia Hovind" (account 0811). From January 14, 1998, through January 16, 2001, petitioner maintained an account at the Peoples Bank under the name "Jo Hovind" (account 5201).

[22]For example, on a date not apparent from the record Mr. Hovind's mother died, leaving him an inheritance. Mr. Hovind deposited the inheritance into a CSE account.

[*13] personal expenses, including living expenses,[23] her children's medical expenses,[24] and her children's tuition at Jackson Hole Bible College and Tennessee Temple University. She drafted and signed checks drawn on CSE bank accounts to purchase a piano for her personal use. She drafted and signed at least one check made payable to herself and wrote checks made payable to Eric Hovind,[25] Ryan Hovind, Tanya Hovind, Kent Andrew Hovind, Danielle Hovind, and Chad Hovind.

Petitioner also drafted and signed numerous checks made payable to cash. In 1998 she drafted and signed nine checks to cash drawn on account 8656, totaling $41,000. In 1999 she drafted and signed 39 checks made payable to cash drawn on account 8656, totaling $226,638. In 2000 she drafted and signed 28 checks made payable to cash drawn on account 8656, totaling $258,000. In 2001 she drafted and signed 49 checks made payable to cash drawn on account 8656, totaling $465,700. In 2002 she drafted and signed 46 checks made payable to cash

---

[23]For example, petitioner drafted and signed checks made payable to J.C. Penney and Circuit City.

[24]In 2000 petitioner drafted and signed checks drawn on account 8656 for Kent Andrew Hovind's and Marlissa Hovind's medical expenses.

[25]Petitioner and Mr. Hovind also lent Eric Hovind approximately $50,000 from a CSE account.

**[*14]** drawn on account 8656, totaling $345,250. In 2003 she drafted and signed 37 checks made payable to cash drawn on account 8656, totaling $136,340.

VII.  Criminal Investigation and Proceedings

On a date not apparent from the record, the IRS began investigating the operations of CSE. In 2001 Special Agent Schneider was assigned the case involving CSE. Thereafter, he served summonses in an attempt to obtain records from CSE. Neither petitioner nor Mr. Hovind supplied any records in response to the summonses. Special Agent Schneider attempted to obtain the records through summons enforcement but again received no records.

On April 14, 2004, Special Agent Schneider, along with other special agents from the IRS Criminal Investigation Division, executed a search warrant at the 29 Cummings Road and 21-23 Cummings Road properties. During execution of the search warrant Special Agent Schneider asked petitioner whether there was any cash on the premises. Petitioner informed Special Agent Schneider that there was approximately $3,000 in cash; however, Special Agent Schneider found $42,000 in cash on the premises. Of the $42,000, approximately $14,000 was in a safe next to petitioner's desk, and approximately $15,000 was in a night stand in petitioner and Mr. Hovind's bedroom.

[*15]  In addition to the cash, Special Agent Schneider found an employee list, bank records, and boxes of checks in and around petitioner's desk.  Although petitioner was not initially a target of the investigation, Special Agent Schneider eventually expanded the investigation to include petitioner after reviewing the items seized pursuant to the search warrant.

On July 11, 2006, petitioner was indicted on 45 counts of structuring monetary transactions to avoid financial reporting requirements.[26]  On October 17, 2006, a jury trial commenced in the U.S. District Court for the Northern District of Florida, Pensacola Division.  The jury found petitioner guilty on all counts, and the District Court sentenced petitioner to one year and one day of incarceration and three years of supervised release and required her to pay a $3,500 fine and a $4,500 special monetary assessment.[27]

---

[26]Petitioner was indicted on the basis of the checks she had drafted to cash and endorsed.  Tit. 31 U.S.C. sec. 5324(a)(3) (2006) prohibits an individual from structuring a transaction to avoid a cash transaction report.  Tit. 31 U.S.C. sec. 5324(d) (2006) imposes a criminal penalty of a fine, imprisonment, or both against an individual who structures transactions to evade reporting requirements.

[27]Mr. Hovind was indicted on 45 counts of structuring monetary transactions to avoid reporting requirements, 12 counts of willfully failing to deduct and pay Federal income and withholding taxes for employees of CSE, see sec. 7202, and 1 count of obstructing the administration of the internal revenue laws, see sec. 7212(a).  The jury found Mr. Hovind guilty on all counts.  The District Court sentenced Mr. Hovind to 120 months' incarceration and three years' supervised

(continued...)

**[\*16]** The District Court subsequently issued forfeiture orders as to petitioner and Mr. Hovind. Under the forfeiture orders, petitioner and Mr. Hovind were liable individually and jointly in the amount of $430,400. On June 27, 2007, the court entered its first Order Forfeiting Substitute Property against petitioner and Mr. Hovind, which forfeited petitioner's and Mr. Hovind's interests in account 8577 and 10 properties.[28] On October 8, 2008, the court entered its second Order Forfeiting Substitute Property, which forfeited petitioner's and Mr. Hovind's interests in account 1872.[29]

## VIII. Civil Examination

In 2007 respondent began an examination in respect of petitioner and Mr. Hovind. IRS Revenue Agent AlyceFaye was assigned to petitioner's case. Revenue Agent AlyceFaye mailed petitioner a letter requesting that petitioner

---

[27](...continued)
release and required him to pay a $2,000 fine, a $5,800 special monetary assessment, and $604,875 in restitution.

[28]The properties included the 5720 and 5800 North Palafox properties, the 21-23, 29, 100, 116, and 400 Cummings Road properties, and the 12 and 120 Oleander Road properties.

[29]On December 30, 2008, the U.S. Court of Appeals for the Eleventh Circuit affirmed petitioner's and Mr. Hovind's convictions and the forfeiture orders. United States v. Hovind, 305 Fed. Appx. 615 (11th Cir. 2008). Pursuant to Fed. R. Evid. 201, we take judicial notice of the Court of Appeals' opinion.

[*17] contact her. She also attempted to contact petitioner via telephone but received no response. Revenue Agent AlyceFaye eventually held a telephone conference with petitioner and an individual representing himself as petitioner's attorney. During the call Revenue Agent AlyceFaye informed petitioner that she had no records of petitioner's filing tax returns for 1998-99 and 2000-06. Petitioner repeatedly stated that she did not have any taxable income and therefore was not required to file returns for those years.

Petitioner did not provide any records or other information to respondent either before or after the telephone conference. Consequently, respondent used the records seized during the criminal investigation to conduct the examination for petitioner's 1998-99 and 2000-04 tax years and summoned bank records to conduct the examination for petitioner's 2004-06 tax years.[30]

IX.    Petitioner's Tax Reporting and the Notice of Deficiency

Petitioner and Mr. Hovind did not file joint Federal income tax returns for the years at issue. In response to respondent's examination and after respondent's issuance of a so-called 30-day letter, petitioner, on September 5, 2008, untimely filed tax returns for the years at issue. In addition to her involvement with CSE,

---

[30]With respect to petitioner's 2004 taxable year, the bank records seized during the criminal investigation covered approximately the first six months of 2004.

[*18] petitioner maintained a piano lesson business at her home. On the Schedules C attached to her Forms 1040, U.S. Individual Income Tax Return, petitioner reported business income from her piano lesson business. Petitioner also reported "other income", ranging from $14,403 to $15,707, attributable to "[p]ersonal use CSE residence", "[p]ersonal use CSE auto", and "[o]ccupancy of living space".

On November 20, 2009, respondent issued to petitioner a notice of deficiency for the years at issue.[31] Respondent undertook to reconstruct income generated from CSE activities by analyzing deposits into the joint accounts of petitioner and Mr. Hovind, petitioner's and Mr. Hovind's personal accounts, and the CSE accounts during the years at issue. Respondent excluded from taxable net deposits the items that constituted refunds or transfers from another account.

---

[31]Because neither petitioner nor Mr. Hovind cooperated with respondent's requests for information and records, respondent was unable to determine who actually earned the income. Therefore, respondent issued separate notices of deficiency to each of petitioner and Mr. Hovind, determining identical deficiencies.

[*19] Respondent determined the taxable net deposits into the various bank

accounts[32] as follows:

| | Joint accts. | | Personal acct. | CSE accts. | | |
| Year | 8049 | 0811 | 5201 | 8656 | 1872 | Net deposits |
|---|---|---|---|---|---|---|
| 1998 | $50,364 | $2,161 | $639 | $595,001 | -0- | $648,165 |
| 1999 | 29,424 | 1,580 | -0- | 1,154,039 | -0- | 1,185,043 |
| 2000 | 54,450 | -0- | 772 | 1,690,078 | -0- | 1,745,300 |
| 2001 | 39,265 | -0- | -0- | 1,602,251 | -0- | 1,641,516 |
| 2002 | 24,170 | -0- | -0- | 1,778,824 | $40,896 | 1,843,890 |
| 2003 | 22,030 | -0- | -0- | 1,379,678 | 493,956 | 1,895,664 |
| 2004 | 11,398 | -0- | -0- | 1,466,762 | 641,133 | 2,119,293 |
| 2005 | 8,666 | -0- | -0- | 1,515,866 | 749,495 | 2,274,027 |
| 2006 | 3,463 | -0- | -0- | 1,003,370 | 517,661 | 1,524,494 |

In part on the basis of the deposits analysis summarized above, respondent

determined that CSE had gross receipts[33] and deductible expenses[34] as follows:

---

[32]Respondent determined that all deposits into account 5129, a CSE account, were nontaxable transfers. Respondent determined that account 5129 earned $707, $2136, and $2 in interest income in 2000, 2001, and 2002, respectively. Respondent did not include the interest income in calculating CSE's net taxable deposits. Respondent determined that there were no taxable deposits into account 8577, a CSE account.

[33]Respondent reduced CSE's Schedule C gross receipts by the amounts of gross receipts petitioner reported on the Schedules C attached to her untimely filed returns.

[34]To calculate operating expenses, respondent determined CSE's average operating expenses for 1998-99 and calculated the ratio of operating expenses to gross receipts. Respondent used this ratio to calculate operating expenses for 2000-06.

| [*20]Year | Sch. C gross receipts | Wages/Salary expense | Other expenses |
|-----------|----------------------|---------------------|----------------|
| 1998 | $647,045 | $42,500 | $315,123 |
| 1999 | 1,179,423 | 186,087 | 510,785 |
| 2000 | 1,733,803 | 457,914 | 797,549 |
| 2001 | 1,638,732 | 494,321 | 753,817 |
| 2002 | 1,840,280 | 597,208 | 846,529 |
| 2003 | 1,893,591 | 643,226 | 871,052 |
| 2004 | 2,112,794 | 411,662 | 971,885 |
| 2005 | 2,272,682 | 411,662 | 1,045,434 |
| 2006 | 1,524,494 | 411,662 | 701,267 |

Respondent also determined that petitioner received interest income of $707, $2,136, $2, $5, and $2 in 2000, 2001, 2002, 2003, and 2004, respectively.

## X.    Tax Court Proceedings

On January 15, 2010, petitioner filed a petition with this Court contesting respondent's determinations.  Mr. Hovind also filed a petition with this Court contesting respondent's determinations in the separate notice of deficiency issued to him.  Respondent filed motions to calendar and consolidate the two cases for trial, briefing, and opinion.  On December 16, 2010, the Court issued an order directing the parties to show cause why the cases should not be calendared and consolidated. Petitioner responded to this Court's order and objected to the granting of respondent's motions.  By order dated March 14, 2011, the Court denied respondent's motions to calendar and consolidate.  Consequently, we set

[*21] petitioner's case for trial during the Mobile, Alabama, trial session beginning April 25, 2011.

OPINION

I.   Presumption of Correctness and Burden of Proof With Respect to Tax Deficiencies

A.   Presumption of Correctness

The Commissioner's deficiency determination ordinarily is entitled to a presumption of correctness. See Bone v. Commissioner, 324 F.3d 1289, 1293 (11th Cir. 2003), aff'g T.C. Memo. 2001-43. However, when a case involves unreported income, the U.S. Court of Appeals for the Eleventh Circuit, to which an appeal in this case would lie absent a stipulation to the contrary, see sec. 7482(b)(1)(A), (2), has held that the Commissioner's determination of unreported income is entitled to a presumption of correctness only if the determination is supported by a minimal evidentiary foundation linking the taxpayer to an income-producing activity, see Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993), aff'g T.C. Memo. 1991-636. Once the Commissioner produces evidence linking the taxpayer to an income-producing activity, the presumption of correctness applies and the burden of production shifts to the taxpayer to rebut that presumption by establishing that the Commissioner's determination is arbitrary or

**[\*22]** erroneous.  Id. at 1549; see also United States v. Janis, 428 U.S. 433, 441-442 (1976).

Respondent introduced abundant evidence establishing that petitioner was involved in the operations of and had an ownership interest in CSE during the years at issue.  Petitioner managed CSE's financial affairs, purchased assets, and drafted and signed checks.  She also supervised employees and made executive decisions in Mr. Hovind's absence.  We conclude that respondent laid the requisite minimal evidentiary foundation for the contested unreported income adjustments and that respondent's determinations are entitled to a presumption of correctness.

Although her argument is not entirely clear, petitioner appears to contend that respondent's determinations are not entitled to the presumption of correctness because respondent acted arbitrarily in allocating 100% of the income from CSE to both petitioner and Mr. Hovind.  Respondent contends that he may issue separate notices of deficiency to two taxpayers assigning identical items of income to both taxpayers.

The Commissioner "may, in notices of deficiency present alternative claims for deficiencies when there is a basis for doing so.  He may assert, in the alternative, that the same income was received by different taxpayers".  Doggett v. Commissioner, 66 T.C. 101, 103 (1976).  It is well established that the

**[\*23]** Commissioner may take alternative positions to protect the public fisc. See Fayeghi v. Commissioner, 211 F.3d 504, 508 n.3 (9th Cir. 2000), aff'g T.C. Memo. 1998-297; Preston v. Commissioner, 209 F.3d 1281, 1286 (11th Cir. 2000), aff'g in part, vacating in part, and remanding T.C. Memo. 1999-49; Revell, Inc., 273 F.2d 649, 658-660 (9th Cir. 1960); Centel Commcns. Co. v. Commissioner, 92 T.C. 612, 626 n.7 (1989), aff'd, 920 F.2d 1335 (7th Cir. 1990); Doggett v. Commissioner, 66 T.C. at 103.

The Commissioner may assert alternative positions as long as he does not act arbitrarily, capriciously, or in bad faith. See Estate of Goodall v. Commissioner, 391 F.2d 775, 782-783 (8th Cir. 1968), vacating T.C. Memo. 1965-154; Revell, Inc., 273 F.2d at 658-660. The Commissioner may make alternative determinations against spouses. See Doggett v. Commissioner, 66 T.C. at 103. The fact that the Commissioner "has made a separate determination of tax against each of the * * * spouses for the same tax liability does not negate the presumption of correctness as to either notice." Smith v. Commissioner, T.C. Memo. 1996-292, slip op. at 8.

Respondent issued separate notices of deficiency to petitioner and Mr. Hovind in which he determined, in effect, that petitioner and Mr. Hovind were each liable for 100% of the net profit generated by CSE and its related activities.

**[\*24]** Respondent issued the notices of deficiency following an examination during which petitioner and Mr. Hovind failed to cooperate with respondent. Because neither petitioner nor Mr. Hovind cooperated during the examination, respondent did not determine how much of the total net income was attributable to petitioner and Mr. Hovind, respectively.

Although petitioner argues otherwise, we find that respondent acted in good faith in issuing the notices of deficiency to both petitioner and Mr. Hovind. On the basis of petitioner and Mr. Hovind's bank records alone, respondent could not determine whether and to what extent petitioner and Mr. Hovind individually were liable for the unreported net income of CSE. The actions of petitioner and Mr. Hovind in withholding information resulted in respondent's determination to assign the same income to each of petitioner and Mr. Hovind.[35]

Furthermore respondent seeks a consistent resolution for both petitioner and Mr. Hovind. Respondent concedes that the notices of deficiency are intended to assert alternative deficiencies and that the Commissioner is seeking to tax the

---

[35]As the U.S. Court of Appeals for the Eighth Circuit noted in Estate of Goodall v. Commissioner, 391 F.2d 775, 782-783 (8th Cir. 1968), vacating T.C. Memo. 1965-154, tax cases often involve substantial sums of money and the Commissioner is charged with protection of the revenues; therefore, "[g]ood faith inconsistency buttressed by acceptable argument, when considered in the framework of the Commissioner's responsibilities, cannot be regarded as an offense which provides a bar to bona fide tax litigation."

**[\*25]** profit only once. See Doggett v. Commissioner, 66 T.C. at 102; Holdner v. Commissioner, T.C. Memo. 2010-175, slip op. at 20-21. We therefore reject petitioner's arguments, and we conclude that respondent's determinations are entitled to the presumption of correctness.

B.     Burden of Proof

Generally, the taxpayer bears the burden of proving that the Commissioner's determinations in a notice of deficiency are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). If, however, a taxpayer produces credible evidence[36] with respect to any factual issue relevant to ascertaining the taxpayer's tax liability and satisfies the requirements of section 7491(a)(2), the burden of proof on any such issue shifts to the Commissioner. Sec. 7491(a)(1). Section 7491(a)(2) requires a taxpayer to demonstrate that he or she complied with the substantiation requirements, maintained all records required under the Code, and cooperated with reasonable requests by the Secretary[37] for witnesses, information,

---

[36]Credible evidence is evidence the Court would find sufficient upon which to base a decision on the issue in the taxpayer's favor, absent any contrary evidence. See Higbee v. Commissioner, 116 T.C. 438, 442 (2001).

[37]The term "Secretary" means "the Secretary of the Treasury or his delegate", sec. 7701(a)(11)(B), and the term "or his delegate" means "any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to

(continued...)

**[\*26]** documents, meetings, and interviews. See also Higbee v. Commissioner, 116

T.C. 438, 440-441 (2001). The taxpayer bears the burden of proving that all of the

section 7491(a) requirements have been satisfied. Rolfs v. Commissioner, 135 T.C.

471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

Petitioner contends that the burden of proof should shift to respondent under

section 7491(a) because she produced credible evidence and satisfied the

requirements of section 7491(a)(2).[38] We disagree. The record establishes that

petitioner did not cooperate with respondent's reasonable requests and did not

maintain the required records. Accordingly, petitioner bears the burden of proof.

See Higbee v. Commissioner, 116 T.C. at 440-441.

II.     Petitioner's Income for the Years at Issue

    A.     Applicability of the Bank Deposits Method

Gross income includes "all income from whatever source derived". Sec.

61(a). A taxpayer must maintain books and records establishing the amount of his

---

[37](...continued)
perform the function mentioned or described in the context", sec. 7701(a)(12)
(A)(i).

[38]In her brief petitioner contends only that she introduced credible evidence
and cooperated with all reasonable requests by the Secretary. She does not address
whether she complied with the substantiation requirements or maintained all
required records.

[*27] or her gross income. Sec. 6001. If a taxpayer fails to maintain and produce the required books and records, the Commissioner may determine the taxpayer's income by any method that clearly reflects income. See sec. 446(b); Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989); sec. 1.446-1(b)(1), Income Tax Regs. The Commissioner's reconstruction of income "need only be reasonable in light of all surrounding facts and circumstances." Petzoldt v. Commissioner, 92 T.C. at 687.

The bank deposits method is a permissible method of reconstructing income. See Clayton v. Commissioner, 102 T.C. 632, 645 (1994); see also Langille v. Commissioner, T.C. Memo. 2010-49, aff'd, 447 Fed. Appx. 130 (11th Cir. 2011). Bank deposits constitute prima facie evidence of income. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The Commissioner need not show the likely source of a deposit treated as income, but the Commissioner "must take into account any nontaxable source or deductible expense of which * * * [he] has knowledge" in reconstructing income using the bank deposits method. See Clayton v. Commissioner, 102 T.C. at 645-646. However, the Commissioner need not follow any "leads" suggesting that a taxpayer has deductible expenses. DiLeo v. Commissioner, 96 T.C. 858, 872 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

[*28] After the Commissioner reconstructs a taxpayer's income and determines a deficiency, the taxpayer bears the burden of proving that the Commissioner's use of the bank deposits method is unfair or inaccurate. See Clayton v. Commissioner, 102 T.C. at 645. The taxpayer must prove that the reconstruction is in error and may do so, in whole or in part, by proving that a deposit is not taxable. See id.

Respondent introduced credible evidence that petitioner did not maintain adequate books and records with respect to her income. Although the record contains evidence that she maintained some records with respect to the operations of CSE, these records alone do not clearly reflect CSE's income. See Holland v. United States, 348 U.S. 121, 133-134 (1954). Petitioner did not maintain any records with respect to other income and/or her proper share of CSE's income. Therefore, we find that it was reasonable for respondent to use an indirect method, i.e., the bank deposits method, to reconstruct her income.

For each year at issue respondent reconstructed petitioner's income using the bank deposits method. Respondent analyzed petitioner's bank records and prepared schedules that summarized the deposits to, disbursements from, and other transactions occurring in petitioner's and CSE's bank accounts during the years at

**[*29]** issue and identified deposits that were not taxable.[39]  Respondent has properly reconstructed petitioner's income using the bank deposits method for the years at issue.  Accordingly, the burden of proof falls on petitioner to demonstrate that respondent's determinations are arbitrary or erroneous.

### B.    Petitioner's Arguments

Petitioner does not assign error to respondent's use of the bank deposits method or respondent's reconstruction of income.  Petitioner contends only that respondent may not assign the unreported income to her because the unreported income is attributable entirely to Mr. Hovind.  Although her argument is not entirely clear, petitioner appears to argue that the doctrine of collateral estoppel precludes respondent from relitigating the issue of whether she may be assigned any of the unreported income from CSE because courts in prior cases have held that Mr. Hovind alone is responsible for CSE's income.  Petitioner also contends that she neither earned nor was responsible for the unreported income and therefore respondent acted erroneously in attributing the unreported income to petitioner.  We address each of petitioner's arguments below.

---

[39]Revenue Agent AlyceFaye credibly testified that she eliminated from taxable income the items she identified as nontaxable, such as interaccount transfers or returned checks.

**[*30]** C.     Collateral Estoppel

1.     In General

Under the doctrine of collateral estoppel, once an issue of fact or law is "actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153 (1979).  Collateral estoppel is a judicially created equitable principle the purposes of which are to protect parties from unnecessary and redundant litigation, to conserve judicial resources, and to foster certainty in and reliance on judicial action.  Id. at 153-154.

The following five conditions must be satisfied before we may apply collateral estoppel in the context of a factual dispute:

> (1) [t]he issue in the second suit must be identical in all respects with the issue decided in the first suit, (2) the issue in the first suit must have been the subject of a final judgment entered by a court of competent jurisdiction, (3) the person against whom collateral estoppel is asserted must have been a party or in privity with a party in the first suit, (4) the parties must actually have litigated the issue in the first suit and resolution of the issue must have been essential to the prior decision, and (5) the controlling facts and applicable legal principles must remain unchanged from those in the first suit.

Bussell v. Commissioner, 130 T.C. 222, 239-240 (2008); see also Ron Lykins, Inc. v. Commissioner, 133 T.C. 87, 101 (2009); Peck v. Commissioner, 90 T.C. 162,

**[\*31]** 166-167 (1988), aff'd, 904 F.2d 525 (9th Cir. 1990).  The party asserting

collateral estoppel as an affirmative defense, in this case petitioner, bears the burden

of proof.  See Rule 142(a).

Petitioner did not affirmately plead collateral estoppel in her pleadings as

required by Rule 39.  However, respondent did not object to petitioner's raising the

collateral estoppel argument, and respondent argued the issue on brief.  Under these

circumstances, we consider the issue to have been raised and tried by consent of the

parties.  See Rule 41(b); see also LeFever v. Commissioner, 103 T.C. 525, 538

(1994), aff'd, 100 F.3d 778 (10th Cir. 1996).

In support of her argument, petitioner relies on this Court's opinion in Hovind

v. Commissioner, T.C. Memo. 2006-143, aff'd, 228 Fed. Appx. 966 (11th Cir.

2007), and the opinion of the U.S. Bankruptcy Court for the Northern District of

Florida in In re Hovind, 197 B.R. 157 (Bkrtcy. N.D. Fla. 1996).  Petitioner also

relies on the transcript of Mr. Hovind's sentencing proceedings before the U.S.

District Court.

### 2. Hovind v. Commissioner, T.C. Memo. 2006-143

In Hovind this Court reviewed the appropriateness of a proposed levy action

with respect to Mr. Hovind's 1995-97 Federal income tax deficiencies and

additions to tax.  We held that the underlying liability was not properly at issue

[*32] because Mr. Hovind had received a notice of deficiency and a lien notice regarding the liabilities. Id., slip op. at 12. After reviewing the Commissioner's determination for an abuse of discretion, we held that the proposed levy action could proceed. Id., slip op. at 13-14.

In reaching its holding, this Court made no findings with respect to whether petitioner owned, controlled, or operated CSE. Mr. Hovind did not contest, and this Court did not address, the merits of the underlying liabilities. Consequently, the parties did not actually litigate the issue of whether Mr. Hovind alone is responsible for the income of CSE.

### 3. In re Hovind, 197 B.R. 157

In In re Hovind the IRS filed a motion to dismiss, alleging that Mr. Hovind filed the case "in bad faith for the sole purpose of avoiding payment of Federal income taxes." Id. at 158. The U.S. Bankruptcy Court found that Mr. Hovind failed to file tax returns, resisted collection efforts, and provided false information to the court, and therefore it dismissed Mr. Hovind's petition for bankruptcy under chapter 13. Id. at 161.

In its opinion the U.S. Bankruptcy Court did not address Mr. Hovind's liability for the unpaid Federal income taxes. The parties did not actually litigate the issue of whether Mr. Hovind alone was responsible for CSE's income, and the

**[*33]** U.S. Bankruptcy Court made no findings concerning Mr. Hovind or

petitioner's level of dominion and control over CSE's operations.

    4.    <u>Sentencing Transcript</u>

In her brief petitioner relies on statements made by the assistant U.S. attorney

and by the presiding judge at Mr. Hovind's sentencing proceedings.[40] The

statements by the assistant U.S. attorney are not findings of fact that were actually

and necessarily decided by a court of competent jurisdiction. Accordingly, these

statements do not have preclusive effect.

With respect to statements made by the presiding judge, petitioner relies

solely on the following statement made by the court in making an upward

adjustment to the base level offense on the basis that Mr. Hovind was an organizer

and leader of the structuring operation:

> Mr. Hovind, as I've already indicated, was the decision-making
> authority for the operation, and based on the degree of control and
> influence that he exercised over others, including those involved in the
> financial transactions at issue here, I believe I can find and do find that
> the adjustment for being an organizer and a leader of an otherwise
> extensive operation is appropriate, that he did direct the

---

[40]In support of her argument petitioner also cites the transcript of her own sentencing proceedings before the U.S. District Court. Petitioner, however, does not explain why the transcript of her sentencing proceedings should preclude respondent from litigating the issue of whether she bears responsibility for the unreported income at issue in this case.

[*34] activities of those involved in the financial transactions, namely, those activities of his wife, Mrs. Hovind.

Although the presiding judge found that Mr. Hovind "direct[ed] the activities of those involved in the financial transactions", this statement related to Mr. Hovind's role as a director in structuring the cash transactions. We find that the presiding judge did not actually and necessarily decide that Mr. Hovind alone exerted control over CSE. Beyond her statement that Mr. Hovind had "decision-making authority", the presiding judge made no findings with respect to petitioner's and Mr. Hovind's relative involvement with CSE.

Because petitioner has not established that she satisfied any of the conditions for collateral estoppel to apply, we reject petitioner's collateral estoppel argument.

D.    Allocation of Income

Section 61(a) defines gross income as "all income from whatever source derived, including (but not limited to) the following items:  (1) Compensation for services, including fees, commissions, fringe benefits, and similar items; (2) Gross income derived from business; (3) Gains derived from dealings in property; (4) Interest; (5) Rents".  The definition is construed broadly and extends to all accessions to wealth, clearly realized, over which the taxpayer has complete

**[*35]** control.  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).

As the Supreme Court explained, a gain "constitutes taxable income when its

recipient has such control over it that, as a practical matter, he derives readily

realizable economic value from it."  Rutkin v. United States, 343 U.S. 130, 137

(1952).

When the Commissioner reconstructs income using the bank deposits method,

the taxpayer's gross income includes deposits into all accounts over which the

taxpayer has dominion and control including deposits into the taxpayer's personal

bank accounts.  See Chambers v. Commissioner, T.C. Memo. 2011-14, slip op. at

17; Price v. Commissioner, T.C. Memo. 2004-103, slip op. at 25; Cohen v.

Commissioner, T.C. Memo. 2003-42, slip op. at 9; Woodall v. Commissioner, T.C.

Memo. 2002-318, slip op. at 7; Woods v. Commissioner, T.C. Memo. 1989-611,

aff'd without published opinion, 929 F.2d 702 (6th Cir. 1991).  A taxpayer has

dominion and control when the taxpayer is free to use the funds at will.  Rutkin, 343

U.S. at 137.  Use of funds for personal purposes indicates dominion and control.

Woods v. Commissioner, T.C. Memo. 1989-611.

Petitioner testified that she had little involvement with the operation of

CSE.  Petitioner further testified that she signed checks on behalf of CSE only

[*36] when Mr. Hovind told her to do so. She also testified that she did not draft the checks and that she only signed blank checks.[41]

We find petitioner's testimony to be self-serving, unreliable, and not credible. Petitioner had signatory authority and exercised control over CSE's accounts. She drafted and signed checks drawn on CSE accounts during the years at issue. Her involvement with CSE during the years at issue was extensive. Petitioner supervised employees, made executive decisions in Mr. Hovind's absence, and maintained some records.

The record also contains ample credible evidence that petitioner managed CSE's financial affairs,[42] including evidence that petitioner reconciled CSE's accounts and advised Mr. Hovind on financial matters. In affirming petitioner's and Mr. Hovind's criminal convictions, the U.S. Court of Appeals for the 11th Circuit stated that "[c]ompany documents and records of the transactions

---

[41]With respect to the checks drawn on account 1872 for the period from November 29, 2002, through December 29, 2006, it appears that Mr. Hovind signed all of the checks. It is unclear whether petitioner, Martha Harris, a CSE employee, or Mr. Hovind drafted the checks. With respect to the checks drawn on account 8656 between July 30, 1999, and January 30, 2004, it appears that petitioner drafted and signed most of the checks.

[42]Special Agent Schneider testified that petitioner was Mr. Hovind's "right-hand man" and that petitioner controlled CSE's finances and made all business decisions in Mr. Hovind's absence.

**[*37]** established that * * * [petitioner] controlled the finances of * * * [CSE] and controlled most of the checks that were cashed." United States v. Hovind, 305 Fed. Appx. 615, 617 (11th Cir. 2008). On the basis of the entire record, we find that petitioner exercised dominion and control over CSE bank accounts.

Although we reject petitioner's argument that Mr. Hovind alone exercised dominion and control over CSE's accounts, the preponderance of credible evidence in the record demonstrates, and we so find, that petitioner was actively involved in the operation of CSE and that she and Mr. Hovind jointly owned and operated CSE. Respondent has introduced no credible evidence that petitioner was the sole owner of CSE or that Mr. Hovind had only minimal involvement in CSE's operation. Accordingly, we are faced with the task of determining how much of CSE's net profit should be allocated to petitioner.[43]

Neither party introduced any definitive proof regarding a more precise allocation of income between petitioner and Mr. Hovind or credible evidence regarding the scope of petitioner's and Mr. Hovind's involvement in CSE. In the absence of credible evidence regarding a more precise basis for allocating the net

---

[43]We recognize respondent's acknowledgment that he is seeking to tax CSE's profits only once. Petitioner and Mr. Hovind, however, did not file joint returns for the years at issue, and therefore they are not jointly and severally liable for the determined income tax deficiencies.

[*38] income generated by CSE,[44] we will allocate income to petitioner in accordance with our finding that petitioner and Mr. Hovind jointly owned and controlled CSE. Because petitioner did not introduce any credible evidence to support a finding that her ownership interest in CSE was more or less than 50%, we shall allocate 50% of the unreported net profit attributable to CSE to her as unreported income. See, e.g., McKenzie Family Trust v. Commissioner, T.C. Memo. 1984-9. Accordingly, we find that petitioner had unreported income equal to 50% of the net profit attributable to CSE, defined as CSE's gross receipts reduced by the Schedule C expenses allowed in the notice of deficiency, for the years at issue.[45] Because we find that

---

[44]Neither party addressed the effect of State law on petitioner's right to income with respect to a joint bank account or an unincorporated business. Under Florida law, petitioner and Mr. Hovind likely held their interests in the joint bank accounts and CSE as tenancies by the entirety. See Beal Bank, SSB v. Almand & Assocs., 780 So. 2d 45, 58-59 (Fla. 2001); see also Clements v. Clements, 509 So. 2d 957, 958 (Fla. Dist. Ct. App. 1987). "When a married couple holds property as a tenancy by the entireties, each spouse is said to hold it 'per tout,' meaning that each spouse holds the 'whole or the entirety, and not a share, moiety, or divisible part.'" Beal Bank, SSB, 780 So. 2d at 53. While, under State law, petitioner may have had the right to the entirety of income in the joint bank accounts and earned by CSE, the issue in the current proceeding is the appropriate allocation of that income for Federal tax purposes. Because we are convinced that petitioner and Mr. Hovind jointly owned and controlled CSE and its related activities, we shall allocate only a portion of the net income to petitioner.

[45]Additionally, we note that petitioner had income attributable to her piano lesson business that was reported on the Schedules C attached to her untimely

(continued...)

**[\*39]** both petitioner and Mr. Hovind had dominion and control over CSE's accounts during the years at issue and we allocate the income accordingly, we also find that petitioner has unreported income equal to 50% of the interest income earned on CSE's accounts during the years at issue. Finally, we find that petitioner had unreported income equal to 100% of the deposits into her personal account during the years at issue.

III.     Section 6651(a)(1) Additions to Tax

Section 6651(a) imposes an addition to tax for failure to timely file a return in the amount of 5% of the tax liability required to be shown on the return for each month during which such failure continues, but not exceeding 25% in the aggregate, unless it is shown that such failure is due to reasonable cause and not due to willful neglect. See sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 245 (1985). Reasonable cause exists if the taxpayer exercised ordinary business care and prudence but was unable to file the return within the time prescribed by law. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect is a "conscious, intentional failure or reckless indifference." Boyle, 469 U.S. at 245.

---

[45](...continued)
filed returns. The total unreported income allocated to petitioner pursuant to this opinion shall be adjusted appropriately in the Rule 155 computations to reflect the income that she reported.

**[\*40]**  Under section 7491(c), respondent has met his burden of production because petitioner admits, and the record clearly establishes, that petitioner failed to file her 1998-99 and 2000-06 tax returns by the due dates.  Petitioner argues that she had reasonable cause for failing to timely file her returns because she believed that she was not required to file returns for the years at issue.

A taxpayer's mistaken belief that no return is required under the law does not necessarily constitute reasonable cause for failure to file a return.  See Beck Chem. Equip. Corp. v. Commissioner, 27 T.C. 840, 860 (1957); P. Dougherty Co. v. Commissioner, 5 T.C. 791, 800 (1945), aff'd, 159 F.2d 269 (4th Cir. 1946).  A taxpayer who decides not to file a return must use reasonable care to ascertain that no return was necessary.  See Beck Chem. Equip. Corp. v. Commissioner, 27 T.C. at 858-860.

Reasonable reliance on the advice of a tax adviser that no return is required to be filed may constitute reasonable cause for a taxpayer's failure to file the return.  See Boyle, 469 U.S. at 250-251 n.9.  The taxpayer must show that:  (1) the adviser was a competent and qualified professional who had sufficient expertise to justify the taxpayer's reliance on him, (2) the taxpayer provided all necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.  See Neonatology Assocs., P.A. v. Commissioner,

**[*41]** 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Estate of La Meres v. Commissioner, 98 T.C. 294, 315-316 (1992).

Petitioner testified that she did not file tax returns for the years at issue on the basis of her mother's advice. Petitioner testified that her mother, who is not a certified public accountant, was a tax return preparer who had been preparing tax returns for approximately 25 years. Petitioner further testified that she told her mother how much she earned from piano lessons and that her mother advised her that she did not need to file a return.

Petitioner also testified that she talked to other individuals about whether she was required to file a tax return. Petitioner testified that she spoke with John Schlabach, a certified public accountant. She testified that she told Mr. Schlabach about her income from the piano lessons and that he advised her that she did not need to file a return. She further testified that she did not show either her mother or Mr. Schlabach the checks she had drafted and signed drawn on CSE accounts.

In the absence of corroborating evidence, we are not required to accept petitioner's self-serving testimony. See Tokarski v. Commissioner, 87 T.C. at 77. Furthermore, petitioner did not introduce into evidence any documentation regarding her meetings with Mr. Schlabach, and petitioner did not call either her mother or Mr. Schlabach as a witness. A taxpayer's failure to call witnesses and

**[*42]** produce relevant documentary evidence within her control supports an inference that such testimony and documentation would not support her position. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947).

Petitioner's testimony is neither credible nor sufficient, even if we believed it, to establish that petitioner had reasonable cause for her failure to file timely returns for the years at issue. We sustain respondent's determination that petitioner is liable for the section 6651(a)(1) additions to tax.

## IV. Section 6663(a) Fraud Penalties

If any part of an underpayment on a return is due to fraud, section 6663(a) imposes on the taxpayer filing the return a penalty equal to 75% of the part of the underpayment attributable to fraud. The Commissioner has the burden of proving by clear and convincing evidence that the taxpayer is liable for the fraud penalty. See secs. 6663(a), 7454(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. at 873. To carry his burden of proof, the Commissioner must prove by clear and convincing evidence that (1) an underpayment of tax exists, and (2) some part of the underpayment is due to fraud. See sec. 6663(b). If the Commissioner proves that any part of an underpayment is attributable to fraud, then the entire

**[\*43]** underpayment shall be treated as attributable to fraud unless the taxpayer shows by a preponderance of the evidence that a part was not so attributable. See id.

### A.    Underpayment of Tax

In the notice of deficiency respondent determined that petitioner underpaid her Federal income tax by $111,959, $192,763, $191,334, $153,432, $153,300, $135,442, $265,445, $297,353, and $146,487 for 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, and 2006, respectively. As discussed supra pp. 38-39, we find that petitioner had unreported income equal to 50% of the net profit attributable to CSE, 50% of the income attributable to deposits into joint accounts, and 100% of the income attributable to deposits into her personal account. Accordingly respondent has proven by clear and convincing evidence that petitioner underpaid her Federal income tax for the years at issue.

### B.    Fraudulent Intent

#### 1.    Introduction

If fraud is determined for multiple taxable years, the Commissioner's burden "applies separately for each of the years." Temple v. Commissioner, T.C. Memo. 2000-337, slip op. at 24-25, aff'd, 62 Fed. Appx. 605 (6th Cir. 2003). The Commissioner satisfies this burden by showing that "the taxpayer intended to

[*44] evade taxes known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of taxes." DiLeo v. Commissioner, 96 T.C. at 874. Fraud "does not include negligence, carelessness, misunderstanding or unintentional understatement of income." United States v. Pechenik, 236 F.2d 844, 846 (3d Cir. 1956).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. See DiLeo v. Commissioner, 96 T.C. at 874. Fraud is never presumed and must be established by independent evidence of fraudulent intent. See Baumgardner v. Commissioner, 251 F.2d 311, 322 (9th Cir. 1957), aff'g T.C. Memo. 1956-112. Fraud may be shown by circumstantial evidence because direct evidence of the taxpayer's fraudulent intent is seldom available. See Petzoldt v. Commissioner, 92 T.C. at 699; Gajewski v. Commissioner, 67 T.C. 181, 199-200 (1976), aff'd without published opinion, 578 F.2d 1383 (8th Cir. 1978). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. See Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). Any conduct likely to mislead or conceal may constitute an affirmative act of evasion, see Spies v. United States, 317 U.S. 492, 499 (1943), and an intent to mislead may be inferred from a pattern of such conduct, see Webb v. Commissioner, 394 F.2d 366, 379 (5th Cir. 1968), aff'g T.C. Memo. 1966-81.

**[*45]** However, fraud is not proven when a court is left with only a suspicion of fraud, and even a strong suspicion is not sufficient to establish a taxpayer's liability for the fraud penalty. See Olinger v. Commissioner, 234 F.2d 823, 824 (5th Cir. 1956), aff'g in part, rev'g in part on another ground T.C. Memo. 1955-9; Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950); Green v. Commissioner, 66 T.C. 538, 550 (1976).

2.      Badges of Fraud

Because it is difficult to prove fraudulent intent by direct evidence, the Commissioner may establish fraud by circumstantial evidence, which includes various "badges of fraud" (hereinafter, factors) on which the courts often rely. See Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; DiLeo v. Commissioner, 96 T.C. at 875. The factors focus on whether the taxpayer engaged in certain conduct that is indicative of fraudulent intent, such as: (1) understating income; (2) failing to maintain adequate records; (3) offering implausible or inconsistent explanations; (4) concealing income or assets; (5) failing to cooperate with tax authorities; (6) engaging in illegal activities; (7) providing incomplete or misleading information to the taxpayer's tax return preparer; (8) offering false or incredible testimony; (9) filing false documents, including filing false income tax returns; (10) failing to file tax returns; and (11)

**[\*46]** engaging in extensive dealings in cash.[46]  See Bradford v. Commissioner, 796 F.2d at 307-308; Parks v. Commissioner, 94 T.C. 654, 664-65 (1990); Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); Lipsitz v. Commissioner, 21 T.C. 917 (1954), aff'd, 220 F.2d 871 (4th Cir. 1955); see also Morse v. Commissioner, T.C. Memo. 2003-332, aff'd, 419 F.3d 829 (8th Cir. 2005).  The existence of any one factor is not dispositive, but the existence of several factors is persuasive circumstantial evidence of fraud.  See Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); Petzoldt v. Commissioner, 92 T.C. at 700.

Respondent contends that the following factors are present in this case:  (1) petitioner understated her income for the years at issue; (2) petitioner failed to maintain adequate records for the years at issue;  (3) petitioner offered implausible or inconsistent explanations with regard to her role at CSE and her recordkeeping during the years at issue; (4) petitioner concealed income and assets for the years at issue; (5) petitioner failed to cooperate with tax authorities regarding the years at issue; (6) petitioner engaged in, and concealed, illegal activities during the years

---

[46]These factors are not exclusive.  See Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

**[*47]** at issue; (7) petitioner failed to timely file returns for the years at issue; and (8) petitioner engaged in extensive dealings in cash during the years at issue.[47]

### a. Understating Income

A pattern of substantially underreporting income for several years is strong evidence of fraud, particularly if the reason for the understatements is not satisfactorily explained or due to innocent mistake. See Holland, 348 U.S. at 137-139; Spies, 317 U.S. at 499; Webb v. Commissioner, 394 F.2d at 379.

On her untimely filed returns, petitioner reported taxable income of $9,194, $9,199, $8,972, $8,749, $9,418, $9,145, $9,495, $8,564, and $7,257 for 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, and 2006, respectively. Respondent determined that petitioner underreported her taxable income by $269,668, $459,894, $456,154, $370,739, $374,175, $356,994, $702,009, $786,846, and $386,706 for 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, and 2006, respectively. We have found that petitioner is responsible for 50% of the net profit attributable to CSE, 50% of the income attributable to deposits into joint accounts, and 100% of the income attributable to deposits into her personal

---

[47]Respondent also contends that petitioner filed false documents for the years at issue. Because we find that respondent has proven that the other factors are present in this case, we need not address whether petitioner filed false documents for the years at issue.

**[\*48]** account. Petitioner failed to report over 90% of her total taxable income for each of the years at issue.

We find that petitioner substantially underreported her income for 1998-99 and 2000-06. Given the amount of her underreporting, her pattern of underreporting income, and her lack of any satisfactory explanation for underreporting, petitioner's understatements are persuasive evidence of fraudulent intent.

### b. Failing To Maintain Adequate Records

The failure to maintain adequate records supports a finding of fraud. See Truesdell v. Commissioner, 89 T.C. 1280, 1302-1303 (1987); see also Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980). Although we consider the taxpayer's level of expertise, a taxpayer is not excused from keeping accurate records when the taxpayer has experience operating his or her own business. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), aff'g T.C. Memo. 1985-63.

In a letter attached to her untimely filed returns, petitioner wrote: "I have not kept financial records, as I did not know that I needed to do so." Petitioner introduced no records of her income and did not substantiate the amounts she claimed as income on her tax returns.

**[\*49]**  Although petitioner claimed that she was unaware of the obligation to keep financial records, we reject this explanation as not credible.  Accordingly, petitioner's failure to keep and/or provide records of income and expenses is indicative of fraud.

### c.  Implausible or Inconsistent Explanations

A taxpayer's implausible or inconsistent explanations for his or her actions may constitute circumstantial evidence of fraudulent intent.  See Bradford v. Commissioner, 796 F.2d at 307-308; Bahoric v. Commissioner, 363 F.2d 151, 153 (9th Cir. 1966); Gagliardi v. United States, 81 Fed. Cl. 772, 784 (2008).  A taxpayer's filings and testimony may provide evidence of implausible or inconsistent explanations.  See Goldston v. Commissioner, T.C. Memo. 2011-9, slip op. at 8-9.

Petitioner gave implausible and inconsistent explanations for her conduct throughout the trial and on brief.  She testified that she wrote checks only at the direction of Mr. Hovind but later testified that Mr. Hovind frequently traveled and that she had implied permission to write checks.  She also testified that she merely signed blank checks and that Ms. Harris was the individual primarily responsible for drafting the checks.  At trial, however, petitioner acknowledged that she drafted and signed numerous checks drawn on CSE's accounts.

**[\*50]** Petitioner repeatedly asserted that she had little to no involvement with the operation of CSE, although the record is replete with evidence that petitioner worked at CSE in a managerial capacity and acted as coowner of the business with Mr. Hovind. Petitioner continued to refer to CSE's payment of her personal expenses as nontaxable "love offerings" although she filed returns acknowledging that some part of those payments was taxable as income to her.

Finally, petitioner argues that she lacked the intent to evade tax and therefore we cannot find her liable for the civil fraud penalties. She points to the fact that she filed amended returns once she was made aware of her Federal filing obligations. Petitioner also contends that any fraudulent intent during the years at issue was attributable to Mr. Hovind. However, we find that it is more reasonable to infer from petitioner's course of conduct that her true intention was to conceal substantially all of her income and to take her chances that the fraud would not be discovered. Our finding is supported by the fact that she did not amend her returns until after respondent began a civil investigation in respect of her. Furthermore, the record shows that petitioner was an active participant in the operation of CSE and, along with Mr. Hovind, engaged in a course of conduct designed to conceal and mislead. Petitioner's assertion of implausible and inconsistent explanations is circumstantial evidence of her fraudulent intent.

**[\*51]**             d.      <u>Concealing Assets or Income</u>

An intent to evade tax may be inferred from "concealment of assets or covering up sources of income". <u>Spies</u>, 317 U.S. at 499. Engaging in transactions likely to mislead or conceal is evidence of fraudulent intent. <u>Id.</u>; <u>see also</u> <u>Simco Auto. Pump Co. v. Commissioner</u>, T.C. Memo. 1999-235, slip op. at 18-19, <u>aff'd without published opinion</u>, 238 F.3d 422 (6th Cir. 2000). A taxpayer's use of a business to conceal the personal nature of expenses is evidence of fraud. <u>See</u> <u>Benes v. Commissioner</u>, 42 T.C. 358, 383 (1964), <u>aff'd</u>, 355 F.2d 929 (6th Cir. 1966); <u>Evans v. Commissioner</u>, T.C. Memo. 2010-199, slip op. at 13; <u>Romer v. Commissioner</u>, T.C. Memo. 2001-168, slip op. at 45-46.

During the years at issue petitioner and Mr. Hovind acquired property using funds in CSE's accounts. While some properties initially were titled in petitioner's and Mr. Hovind's names, other properties initially were titled in Mr. Hovind's name alone or in CSE's name. Petitioner and Mr. Hovind titled the properties in different names even though they used their shared funds to purchase the properties and petitioner drafted and signed checks to purchase the properties.

Through a series of transactions, petitioner and Mr. Hovind purportedly transferred the properties to the Faith Baptist Fellowship and later to various ministerial trusts. Petitioner signed many of the documents that purported to

**[\*52]** transfer, for little to no value, properties she and Mr. Hovind had purchased. The dates of transfer coincide with actions and inquiries by respondent with respect to petitioner, Mr. Hovind, and CSE.

While petitioner signed documents purportedly transferring the properties, she and Mr. Hovind continued to occupy, control, and rent the properties. Furthermore, the District Court found that petitioner maintained ownership interests in all of the properties purportedly transferred to the ministerial trust. Respondent introduced evidence that petitioner willfully concealed these assets from the IRS.

Additionally, petitioner wrote checks drawn on CSE's accounts to herself, to her children, and to cash. She used the funds in CSE's accounts to pay personal living expenses for herself and her family members, thereby disguising her personal expenses as business expenses. See, e.g., Romer v. Commissioner, T.C. Memo. 2001-168, slip op. at 45-46.

We find that petitioner concealed income by engaging in purported transactions to transfer properties and by using business bank accounts to pay her personal living expenses.

**[\*53]**    e.  <u>Failing To Cooperate With Tax Authorities</u>

Failure to cooperate with revenue agents during an investigation is a badge of fraud. See <u>Korecky v. Commissioner</u>, 781 F.2d at 1568-1569; <u>Lord v. Commissioner</u>, 525 F.2d 741, 747-748 (9th Cir. 1975), <u>aff'g in part, rev'g in part</u> 60 T.C. 199 (1973); <u>Grosshandler v. Commissioner</u>, 75 T.C. at 20. Such failure is persuasive evidence of a taxpayer's guilty knowledge. See <u>Prof'l Servs. v. Commissioner</u>, 79 T.C. 888, 932-933 (1982).

With respect to respondent's criminal investigation, petitioner testified that she copied all bank records, payroll records, and bank statements and delivered them to Special Agent Schneider. Petitioner further testified that she did not know how much cash was on the premises when Special Agent Schneider arrived to conduct his investigation and that she did not have access to the cash on the premises. With respect to respondent's examination, petitioner testified that she was not contacted by anyone from the IRS concerning her personal income tax until July 2008. Petitioner testified that she attempted to cooperate with Revenue Agent AlyceFaye's investigation and that Revenue Agent AlyceFaye did not specifically request that petitioner provide any records.

Although petitioner testified that she cooperated with respondent's revenue agents, we find petitioner's testimony to be self-serving and not credible. In

[*54] contrast, respondent introduced credible evidence that petitioner provided no records to Special Agent Schneider and that petitioner misled Special Agent Schneider about the amounts of, and her access to, cash hoards at the 29 Cummings Road property.[48] Respondent also introduced credible evidence that petitioner and her attorney attempted to impede Revenue Agent AlyceFaye's civil investigation of petitioner.[49] Petitioner attempted to cooperate with respondent only after she had already exerted considerable resistance to respondent's collection efforts. See Powell v. Granquist, 252 F.2d 56, 61 (9th Cir. 1958). Petitioner's failure to cooperate with tax authorities is indicative of fraud.

### f. Engaging In or Concealing Illegal Activities

Engaging in illegal activity, even if the taxpayer is not charged with a tax crime, is circumstantial evidence of fraud. Niedringhaus v. Commissioner, 99

---

[48]Petitioner signed a notice attempting to discourage respondent's criminal investigators from entering her properties or performing their official duties. The notice purported to warn Federal agents that petitioner would pursue legal remedies against the Federal agents who interfered.

[49]Revenue Agent AlyceFaye testified that although she did not specifically request any records from petitioner during a telephone conference with petitioner and her attorney she attempted to request records but petitioner repeatedly interrupted and cut off her requests. She further testified that petitioner provided no records or documentation during the course of the examination.

**[\*55]** T.C. at 211; see also Asbury v. Commissioner, T.C. Memo. 2011-107, slip op. at 19-20; Langille v. Commissioner, T.C. Memo. 2010-49, slip op. at 48-49.

In 2006 petitioner was convicted of structuring transactions in order to avoid cash transaction reporting requirements. The record supports a finding that petitioner engaged in this illegal activity to conceal income from Federal authorities, and we so find. Petitioner's participation in illegal activities is persuasive circumstantial evidence of fraud.

g.      Failing To File Returns

Failure to file tax returns, even over an extended period, does not establish fraud per se. See Grosshandler v. Commissioner, 75 T.C. at 19. An extended pattern of failing to file tax returns, however, may be persuasive circumstantial evidence of fraud. See Marsellus v. Commissioner, 544 F.2d 883, 885 (5th Cir. 1977), aff'g T.C. Memo. 1975-368; see also Runkle v. Commissioner, T.C. Memo. 2005-112, slip op. at 22. Untimely filing of tax returns also may be persuasive circumstantial evidence of fraud. See Marcus v. Commissioner, 70 T.C. 562, 577-578 (1978), aff'd without published opinion, 621 F.2d 439 (5th Cir. 1980); Energy Research & Generation, Inc. v. Commissioner, T.C. Memo. 2011-45, slip op. at 43.

[*56] Petitioner did not file her Federal tax returns for the years at issue until after Revenue Agent AlyceFaye contacted her about the civil audit and respondent issued her a 30-day letter. Petitioner did not timely file tax returns for 1998-99 and 2000-06. Petitioner's untimely filing of her tax returns over an extended period is circumstantial evidence of fraud.

h.     Extensive Dealings in Cash

Extensive dealings in cash to avoid scrutiny of a taxpayer's finances is a badge of fraud. See Bradford v. Commissioner, 796 F.2d at 307-308. Fraudulent intent may be inferred when a taxpayer handles his or her affairs in a manner designed "to avoid making the records usual in transactions of the kind". Spies, 317 U.S. at 499. In particular, when a taxpayer's dealings in cash are accompanied by attempts to conceal transactions or avoid cash transaction reporting requirements, that course of conduct is probative evidence of fraud. See Valbrun v. Commissioner, T.C. Memo. 2004-242, slip op. at 8-9.

During the years at issue petitioner drafted and signed checks made payable to cash. Petitioner was the individual at CSE primarily responsible for drafting and signing checks to cash and the individual who went to the bank to withdraw the cash from CSE's accounts. In addition, respondent introduced credible

[*57] evidence that petitioner had access to large amounts of cash and that petitioner stored large amounts of cash in her desk and in her bedroom.

Petitioner was indicted on and convicted of 45 counts of structuring monetary transactions to avoid financial reporting requirements on the basis of her extensive history of drafting and signing checks to cash. Special Agent Schneider testified that petitioner wrote checks to cash in amounts less than $10,000 in order to avoid currency transaction reporting requirements.

Petitioner engaged in extensive cash transactions and was the individual primarily responsible for engaging in those cash transactions. We find that she engaged in these cash transactions in order to avoid financial reporting requirements. Petitioner's extensive dealings in cash are persuasive circumstantial evidence of fraud.

C.    Conclusion

Respondent has proven by clear and convincing evidence that petitioner underpaid her tax liabilities for 1998-99 and 2000-06 and that some part of her underpayment for each year was due to fraud. Petitioner bears the burden of showing by a preponderance of the evidence what portion of each underpayment, if any, is not attributable to fraud. See sec. 6663(b). Petitioner has not argued or introduced any credible evidence to prove that any specific portion of any

[*58] underpayment was not attributable to fraud.[50]  The record overwhelmingly establishes that she acted with fraudulent intent.  Accordingly, we hold that petitioner is liable for the section 6663(a) fraud penalties.

We have considered all the other arguments made by the parties, and to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[50]In the notice of deficiency respondent considered the amounts of income petitioner reported in her late-filed returns and subtracted those amounts in calculating her underpayments.